Hon. F. P. POCHÉ,
Hon. R. B. TODD,
Hon. WM. M. LEVY,
Hon. C. E. FENNER,
} *Associate Justices.*

---

No. 1096.

## C. C. DUSON VS. C. M. THOMPSON.

Cases of contested elections and cases in which the right to office is involved, differ mate-
rially. '

Therefore, Act No. 45 of the Legislature of 1870, providing for the return of Appeals in the
latter cases, does not conflict with sections 40 and 1434 of the Revised Statutes, which are
still in force and regulate Appeals in contested election cases. Decisions in Auld vs.
Walton, 12 An., 825, and Lanier vs. Gallatas, 13 An., 175, affirmed.

Irregularities in Election Returns do not *per se* vitiate the election, and, if there are means
by which the true vote can be ascertained, such means must be resorted to by the Court
before which the contest is pending. After proof made, that the box containing the bal-
lots has not been tampered with, and that the requirements of the law for its custody
have been complied with, it is legal and proper for the Court to order that the box be
opened and the ballots counted, in its presence; and the result of the election as shown
by this counting, should be declared and decreed by the judgment of the Court.

APPEAL from the Thirteenth Judicial District Court, parish of St.
Landry. *Hudspeth, J.*

Duson vs. Thompson.

Henry L. Garland for Plaintiff and Appellant, and F. F. Perrodin, District Attorney for the parish of St. Landry, on the same side.

Lewis & Bro., B. A. Martel, and A. Bailey for Defendant and Appellee:

Until the count is over and consigned to the tally and statement-sheets, and the ballots placed back in the box, the best and only evidence of how electors voted is the ballots deposited by them in the box; because it is these the commissioners resort to to make out their count, and upon these only do they base their returns.

From the moment that the ballots have been taken out and counted, and the result consigned to the tally and statement-sheets, in a manner substantially in accordance with the forms of law, and the ballots returned to the box, these returns become the best evidence of the manner in which electors voted, and the ballots in the box become secondary evidence, and are to be used only under certain conditions and circumstances.

The condition upon which they may be used in evidence, in a contest, is the laying a legal basis. To do this, the contestant must allege and satisfactorily prove that the returns are illegal, because—1st, the same are fatally defective in form; 2d, or falsely state the contents of the ballots as drawn out of the box; 3d, or that they have been subsequently so falsified and altered as not truthfully to represent the contents of the ballots as they were when taken out of the box and counted. This being done, the contestant must show affirmatively that the box has been kept in accordance with the requirements of the statute; that it has not been handled by unauthorized persons; that it could not have been tampered with by anybody; and, lastly, he must conclusively establish the identity of the box.

The decision of the judge of the lower court, that a legal basis had been laid for the recount, is not conclusive upon the jury. It was a ruling upon the sufficiency of evidence. Nor is any appeal necessary from such an interlocutory order, rendered in the course of the trial of a contested election case.

In a contested election case, where only a majority of the jury may render a verdict, if the evidence be contradictory, the unanimous verdict of a jury of the vicinage, upon questions of fraud, credibility of witnesses, and other facts peculiarly within its province, will not be disturbed unless manifestly erroneous.

AUTHORITIES.

*Pleadings*—R. S. sec. 1419; Brightly's Leading Cases, Kneas' case, p. 360; Clark & Hall's Contested Election Cases, Varnum's case, p. 112, Leib's case, p. 165; McCrary's Law of Elections, sec. 281.

*Recount*—Brightly, Kneas' case, p. 360; McCrary's, sections 277, 278, 279, 280, and 291. Bartlett's Contested Elections, Robin's case, p. 138, Archer's case, p. 169, Verree's case, p. 381, Klein's case, p. 574. Cooley on Constitutional Limitations, p. 789.

### ON MOTION TO DISMISS.

The opinion of the Court was delivered by

POCHÉ, J. This is a contested election case, growing out of the election held in this State on December 2, 1879. From the verdict and judgment rendered in favor of defendant plaintiff has appealed, and defendant moves for the dismissal of the appeal on the ground that it was not made returnable ten days after judgment, which was rendered on March 5, 1880, the appeal having been made returnable on the first Monday of July of the same year.

The return-day was suggested and fixed on appellant's own motion and suggestion, and the district judge overruled appellee's motion suggesting a change of the return-day from the date fixed to ten days after the rendition of the judgment.

Appellee contends that this appeal should be governed by and comply with the provisions of law contained in section 7 of Act No. 45, approved March 16, 1870, which section reads as follows :

" That in *all* cases in which the right to office is involved and an appeal is taken from the judgment of the lower court, it *shall* be returnable in ten days after judgment of the lower court, and the Supreme Court on the motion of either party shall proceed to try the same by preference."

And it concludes with the usual repealing clause.

On the other hand, plaintiff contends that his right to this appeal should be tested under the provisions of the act of 1856, incorporated in our Revised Statutes as sections 40 and 1434, which provides in substance:

"That in all contested elections brought before the courts of this State, the party cast shall have the right of appeal to the Supreme Court as in other civil cases, etc.," and that " such appeal shall be considered suspensive in its operation and effect, any law to the contrary notwithstanding ;" and he contends that this act is not repealed by act 45 of 1870, which covers only judgments rendered in cases involving title to office ; that the two statutes are not on the same subject matter, and that the latter law, not affecting the former, does not repeal it, either directly or by implication.

The question presented for our solution is, therefore, whether the

act of 1856 is in conflict or inconsistent with section seven of Act No. 45 of 1870.

Defendant urges that the right to office is the very issue involved in all contested election cases ; that there is no difference in law or in fact between the two classes of cases ; and that the last expression of legislative will regulating appeals in cases involving title to office should alike govern contested election cases, and that the act of 1856, containing a different rule for appeals, is necessarily inconsistent with the act of 1870, and is for that reason repealed and inoperative. This identical proposition was reviewed and discussed in 12 A. 825, and 13 A. 175, wherein the Court interpreted the act of 1853, which was re-enacted in 1855, and contains the identical provisions subsequently enacted in section 7 of act 45, 1870, in connection with the act of 1856, now found in sections 40 and 1434, and the Court reached a different conclusion than that contended for by appellee's counsel in this case. But counsel claim that the Court, then composed of some of the brightest intellects and most learned jurists which have ever honored our bench and bar, signally erred in both cases, and they confidently expect us to overrule the rulings on this point in both cases.

We are constrained to disappoint appellee and his counsel in their expectation. The issue in a contested election case is not a title to office, which may result therefrom, but not necessarily, for the decision may decree that neither party is entitled to the office, by reason of the absolute nullity of the election, as was the case in 13 A. 175. We understand that in such cases the inquiry is directed to the manner and form in which the election was carried on, and in which the results were returned, announced, or promulgated. The action must be begun before the induction of the candidate returned as elected, and the action can be maintained, and the inquiry gone into, only when prayed for in a petition signed by at least twenty voters of the parish.

Under our present laws, a case involving a title to office is an inquiry instituted by the State itself, and is intended to test the right to office of a party already in office by appointment or otherwise. It may be instituted by the proper law-officer, without joining as party plaintiff the person who may claim to be entitled to the office in contest.

We conclude that the two classes of cases are materially different, and that appeals therein are and must be regulated by different laws ; in other words, " that all appeals in cases of contested elections must be considered as falling within the general rule applicable to appeals in all civil cases." 12 A. 826.

We are fortified in our conclusion by the interpretation given to these various enactments by our immediate predecessors in the unreported case of "the State ex rel. John Young vs. Judge of the Thirteenth Judi-

cial District," decided in May, 1879. In that case, relator, who had appealed from a judgment rendered in a case of contested election, applied for a mandamus to compel the District Judge to order the appeal to be returned in ten days, and urged the same reasons now used by appellee for the dismissal of the appeal in this case. The mandamus was refused on the ground that appeals in cases of contested elections should be returned as in all civil cases.

After quoting approvingly from the two decisions in the 12th and 13th Annuals, Chief Justice Manning, as the organ of the Court, says :

"The act of 1856 thus referred to is the law regulating this subject now. It was re-enacted *in totidem verbis*, and forms section 1434 of the Revised Statutes of 1870, just as the act of 1853 (p. 250) declaring that appeals in cases where the right to office is involved shall be returnable in ten days, is re-enacted *in totidem verbis*, and forms section 33 of the same Revisal, and was repeated in the same year, and forms section 7 of the act of March 16, 1870."

The motion to dismiss is therefore overruled.

---

## On the Merits.

At the general election held throughout this State on December 2, 1879, C. C. Duson and C. M. Thompson were competing candidates for the office of sheriff of the parish of St. Landry.

Thompson having been returned as elected by the recorder of the parish, acting as returning officer of election for that particular office, Duson at once began proceedings to contest the election.

In his petition of contest, which is supported, as the law requires, by a petition of at least twenty voters of the parish, he charges several irregularities and illegalities which go to invalidate his opponent's election, but he subsequently has abandoned all other grounds, and on appeal he relies exclusively on the following ground of alleged nullity :

That the votes cast at the third ward poll, known as the Leonville precinct, were not legally returned, in this, that on the day following the election the commissioners of that poll handed to the clerk of the court a document purporting to be their return from said poll (which we shall designate as No. 1), showing the following vote for sheriff: Thompson 128, Duson 75. That later on the same day the commissioners illegally re-opened the box which contained the ballots cast at said poll, and which had been locked, sealed, and delivered by them, as the law required, to the clerk of the court, and took from said box another document, purporting to be a return of the votes cast at said Leonville box (which document we shall designate as No. 2), showing the following vote for sheriff: Thompson 164, Duson 31. That by the illegal addition of docu-

ment No. 2, as a return of votes, the result of the whole vote of the parish was changed to his detriment; the whole vote of the parish, including the vote shown by document No. 1, being as follows: Duson 2914, Thompson 2841, or a majority of 73 for Duson.

Plaintiff complains of the act of the returning officer in receiving or compiling the second document purporting to be a return, and alleges that a written statement signed by the commissioners on the 8th of December, in which they certify that both documents or tally-sheets should be considered as a continuous return of the Leonville box, is a nullity, and should not be considered in the compilation of the votes cast at said election, and charges that the compilation made by said returning officer was erroneous, illegal, null, and void.

To this petition the defendant Thompson answers. He denies that the compiled statements originally returned by the commissioners of election give a majority of votes to the plaintiff. He denies that any amended return of the election at the Leonville poll was made. He denies that the recorder, in making his returns, either considered or used any amended return from that poll. He alleges that the recorder, in compiling the returns of the votes cast at Leonville, took into consideration and based his returns exclusively upon the original returns deposited by the commissioners of election at said poll with the clerk of court and sheriff of the parish; that said original returns consisted of two sheets, one which is admitted to be a tally-sheet, and the other, though erroneously styled and headed a statement-sheet, is in fact also a tally-sheet, and that the tallies on *both* sheets must be added together in order to ascertain the total vote cast for sheriff, as well as the vote for all other officers voted for at that poll; that the two taken together constitute the true list of tallies of the votes at said poll, the one being a continuation of the other; that such was the true intent and purpose of the commissioners, as intrinsically shown by the returns themselves, and by their explanatory certificate, which plaintiff erroneously styles an *amended statement* of votes; that the commissioners at said poll, from a want of knowledge of their duties, neither made nor returned a statement of votes, but made and returned only tally-sheets, an error and omission of frequent occurrence in this parish.

The case was tried by a special jury, who, after a protracted trial, found in favor of defendant in a verdict which for its unusual style and novelty is reproduced in full:

"The special jury empaneled in the above entitled suit, having in full view the great importance of the public interest involved in this case, and the sanctity of our oaths, and after fully and conscientiously weighing the evidence as elicited, and the law applicable to the case, do find that the majority of the good people of the parish of St. Landry

did, on the 2d, day of December, 1879, cast their ballots for C. M. Thompson for the office of sheriff of the parish of St. Landry ; and such being the case, the said C. M. Thompson is entitled to the said office, its responsibilities, duties, privileges, and emoluments.   Witness our hands, duly signed and indorsed on the back of this verdict.

"C. O. Hundley, Foreman ; B. F. Hardesty, Frémont Dupré, Acdoille Fontenot, H. Frilot, Edmond Savant, Delosiar May, Chas. S. Hollier, W. A. Sandoz, Martin Jones, Thos. D. Cooke, Stephen Stuart."

From the judgment rendered thereon plaintiff appealed.

The record discloses the following facts and incidents connected with the election at the Leonville poll, and the manner of holding the same, and of making returns thereon, and which are not disputed by either party :

The election was not held by the three citizens appointed as commissioners by the Police Jury (Rogers, Déjean, and Robin), but by F. C. Carrière, Félix Boudreau, and J. D. Higginbothan, who were selected and sworn as such by one A. L. Durio, justice of the peace, at about 7 o'clock a. m., at which time the appointed commissioners had not yet made their appearance, and it being rumored that they would not act.

After the election was closed, the commissioners, assisted by other citizens, proceeded to count the votes, after which they went together to the courthouse at Opelousas with the box and two duplicate tally-sheets, one of which they delivered to the sheriff, and the other to the clerk.   The duplicate which they handed to the clerk is the document designated as No. 1, and it is written on what is technically known as a statement-sheet, on which is a printed statement, subscribed and sworn to by the commissioners, reciting in substance that the votes tallied thereon *are the votes* cast at the Leonville precinct on the 2d of December, 1879, for and against the ratification of the Constitution, for and against the State debt ordinance, for Governor and other State officers, and for all parish and ward officers which are therein enumerated.

They arrived at the courthouse at about 3 o'clock p. m. on the 3d of December, and delivered this document and the box without delay, taking the clerk's receipt for the same.

A short time thereafter the three commissioners returned to the clerk's office, asked and obtained from him possession of the box and of the key, re-opened the box, and taking therefrom the document hereinabove designated as No. 2, written on a sheet technically known as a tally-sheet, containing in substance identically the same declaration, signed and sworn to, as that in document No. 1, handed the same to the clerk, who placed it in his office along with the document first described.

It appears further that on the 6th of December the recorder of the

parish, who under the law was the returning officer of election for the office of sheriff, as the then sheriff was a candidate for re-election, proceeded to compile the returns of the votes cast for said office, in the whole parish, and to make return thereof to the Secretary of State, and that in compiling the vote of the Leonville precinct he considered and counted the two documents hereinabove described as one return, or as a continuous statement of the votes cast for sheriff at that precinct; and which two statements added together make up the following vote: Thompson 292, Duson 106; and it also appears that the vote as thus counted, added to that of all the other precincts of the parish, foots up the following final result for sheriff: Thompson 3005, Duson 2945, or a majority of sixty for Thompson. The record also shows that on the 8th of December the three commissioners subscribed and handed to the clerk a written statement, in which they declared in substance that the two sheets handed by them, as above recited, to the clerk, are one continuous tally-sheet, and that the two sheets must be added together to show the full vote received by each candidate at the Leonville precinct.

All other allegations, charges of fraud, irregularities, and counter charges of conspiracies to swindle, and of ballot-stuffing, contained in the pleadings, are strenuously advanced and positively denied by the respective parties, who introduced, on each side, countless documents and numerous witnesses, all of which forms a voluminous record of bitter venom and galling acrimony which it is fortunately unnecessary to consider for a correct decision of this cause. The election of 1879 was carried on under the provisions of Act No. 58 of the Legislature of 1877, extra session.

Section twenty prescribes that the election shall begin at 7 o'clock a. m. and close at 6 o'clock p. m.

Section fourteen provides that if within one hour after the time fixed none of the commissioners appointed by the police jury has made his appearance, the persons present shall hold a meeting and select three commissioners to preside at the election.

In this case the commissioners at the Leonville precinct were selected by one individual, A. L. Durio, and without allowing to the absent commissioners the delay of one hour required by the section quoted.

It is conceded that no violation of a directory law on elections shall vitiate the election, but this irregularity is shown for the purpose of establishing the continuous and wanton violation of law which characterized the foundation, as well as the crowning act, of the election held at that precinct. No attempt is made by the defendant to explain, much less to justify, this unusual and illegal haste to organize a poll during the absence of the regularly appointed commissioners; the rumor to

the effect that these commissioners would refuse to act, for the reason that on a previous similar occasion the parish had refused or failed to compensate them for their services, is no justification of this flagrant irregularity, and as the instigator of the proceeding, Durio, is shown by the evidence to have been a political foe of Duson, his motive is easily conjectured ; and the subsequent conduct and acts of Commissioner Carrière, at whose house he had slept on the night before, shows that he was wise in the selection of his man in order to carry out his design.

But proceeding further, the question to be solved is this, which of the two documents handed by the commissioners is the legal return of the votes cast at the Leonville precinct ? or is there any return at all from that precinct ?   While conceding that the correct rule in American elections favors a liberal construction of laws governing returns of elections, and that to give effect to the vote of the citizen, the violation of a directory law by an officer cannot justify the rejection of the votes cast at the polling-place, yet it is equally clear, as stipulated in section 19 of act 58 of 1877, that the election is vitiated where it is impossible to decide what candidate received the majority of votes at the polling-place where the election is contested.

It is also an elementary rule of law that when an act is to be done in writing the instrument must make proof of itself, and this rule is essentially applicable to returns of elections.   The rule is laid down by McCrary, Law of Elections, section 82, in substance as follows :   " The canvassing or return judges must receive and count the votes as shown by the *returns,* and *they cannot go behind the returns for any purpose,* and this necessarily implies that if a paper is presented as a return, and there is a question as to whether it is a return or not, *they must decide that question upon the face of the paper itself."*

If in this case the recorder acting as returning officer in the election for sheriff had been guided by this rule, when he came to consider the effect of the two documents which are described above he would have seen that both documents purported to be separately and singly the return itself of the votes cast at the Leonville precinct; neither paper could by itself show that it was *the* return, to the exclusion of the other, and neither of the documents shows on its face, or contains in any shape or form, any information, statement, or indication tending to show that the one was the beginning, and the other the continuation, of the return or statement of votes polled at that precinct, so as to justify the addition of the two together, so as to get at the correct vote polled ; the very reverse appears, because to each document is appended the sworn declaration of the three commissioners that the votes therein tallied and added are *the* votes that were deposited in the box on the 2nd of December, 1879.

56

Where, then, did the recorder obtain his information that the two sheets *added* together contain the votes cast at the Leonville precinct on that day?

Defendants deny that the officer derived his information from the statement subscribed by the commissioners on the 8th of December, in which they pretend to convey that information. Admitting this theory, the question recurs again as to his source of information in the premises. It must then be from the verbal statements of the commissioners, or of one or two of them. If such is the case, he then received evidence out of or *dehors* the paper itself, or of the two papers separately or jointly, and in thus doing he performed an act reprobated and forbidden by law. It will not be gainsaid that after delivering their returns and the box to the proper officer the official existence of the commissioners was at an end, and they became *functi officiis.* Their appointment encompasses the performance of a special duty, the completion of which fixes the term of their official capacity. Cooley in his Constitutional Limitations, p. 623, says of boards of canvassers: "The board themselves having once performed and fully completed their duty, have no power afterward to reconsider their determination and come to a different conclusion." This is *a fortiori* the case with commissioners, whose duties under our laws are to be performed and completed, if possible, in one day. It is therefore safe to conclude that the three defunct commissioners had no power or authority in law to re-open the box after delivery thereof to the clerk, and to take therefrom the second sheet which they handed to the clerk, and which was subsequently considered by the returning officer as a statement of votes ; and that their written statement of December 8th was a puny usurpation of official authority from which no legal effect can flow and no legal deductions be drawn.

It therefore follows that the returning officer erred in giving effect to both sheets, purporting each to be returns of election from the Leonville precinct. It is admitted by the defendant that the commissioners did not even pretend to have made, sworn to, and delivered the compiled statements required by section 32 of the election law, and that their only returns were the tally-sheets under consideration. Under that law the compiled statements should be and are required as the best evidence, the custom invoked by defendant to the contrary notwithstanding. But in the absence of the best evidence, the returning officer was perhaps justified in having recourse to and considering secondary evidence. And this, in the nature of things, would or should have been the tally-sheet required by law to be kept in duplicates. And here recurs again the difficulty which the officer had to bridge over when he met the two documents purporting each to be *the* statement of the votes cast at that precinct.

Any impartial mind, unaided by evidence *aliunde* or guided by lights beyond the papers, would find it impossible to solve the problem as to whether No. 1 or No. 2, or the two together, should be considered as the correct statement, and would therefore find it impossible from the face of either or both of the papers to decide which candidate had received the majority of the votes cast, and the same impartial mind, guided by our own election law, by McCrary on Laws of Election, in sections 302 and 304, where he provides a remedy in face of the impossibility of ascertaining for whom the majority of votes were given, and by our own Supreme Court in 29 A. 610, rejecting the return of a precinct because the polling-place was changed without due notice to the voters, would irresistibly conclude that both documents, No. 1 and No. 2, should be rejected as secondary evidence to supply the absence of the primary evidence, consisting of the compiled statements required by section 32 ; and that therefore there was no legal return of the election held at the Leonville precinct ; and this conclusion the Court is bound to adopt.

But under American authorities, in order to seek and give effect to the will of the voters of that ward, other evidence, if at hand, or within reach, could and should be used to supply the wanting returns. This evidence was tendered by plaintiff, who prayed the court to open the box and recount the ballots therein found.

Cooley, Constitutional Limitations, says : " But back of this *prima facie* case (made by the certificate of election) the courts may go, and the determination of the State Board may be corrected by those of the district boards, and the latter by the ballots themselves, when the ballots are still in existence and have been kept as required by law."

To that end our statute requires that the boxes, locked and sealed, be delivered in the custody of the clerk, " who shall keep them in his possession in the same condition for six months after the election."

Alleging that the ballots had been kept as required by law, plaintiff moved, and the District Court ordered, that the Leonville box be opened and the ballots therein recounted.

Defendant objected, and has retained his bill of exceptions to the adverse ruling of the court.

While the evidence introduced in support of plaintiff's motion does show that the box opened was the identical Leonville box, yet justice can be done to the parties without formally passing on this bill of exceptions. Defendant has offered no other evidence, and, under our system of voting by secret ballots, none was within his reach, to show, without the legal returns, without the duplicate tally-sheets, without a recount of the ballots, what number of votes had been cast for him at the Leonville box.

By recounting the box, as shown by the tally made under the direc-

tions of the court, the result would show Duson elected by a majority of twenty-eight. If the court erred in re-opening the box and recounting the ballots, there are then no returns from the Leonville box, and that shows a result electing Duson by a majority of one hundred and twenty-six.

The dilemma is fatal to defendant's position, and utterly destroys his *prima facie election*.

In reference to the appeal taken by the parish of St. Landry, complaining of that part of the judgment which condemns the parish to pay the costs of this suit, we find that our predecessors had so decreed in two celebrated cases, and we concur in the reasons which prompted their ruling. We are of opinion that Act No. 59, of April 5, 1880, can have no effect on this cause, which was then pending, and we shall not disturb the judgment in that particular.

It is therefore ordered, adjudged, and decreed that the verdict of the jury be set aside ; that the judgment of the lower court in so far as it decrees C. M. Thompson as elected sheriff of St. Landry be avoided, annulled, and reversed, and in other respects that it be affirmed ; and it, is further ordered that Cornelius C. Duson be decreed to have been legally elected sheriff of the parish of St. Landry at the election held on December 2, 1879.

---

### DISSENTING OPINION.

FENNER, J. Stress of official engagements and the extremely limited delay allowed after the conclusion of the earnest deliberations of the Court upon this important case prevent me from stating, with the fullness which I would desire, the reasons and legal principles upon which I base my dissent from the opinion of the majority of the Court in this case. The doctrine quoted in the majority opinion from McCrary on Elections, that " canvassing and return judges must receive and count the votes as shown by the returns, and cannot go behind the returns for any purpose, and this necessarily implies that if a paper is presented as a return and there is a question as to whether it is a return or not, they must decide that question from what appears upon the face of the paper itself," is undoubtedly correct within the limits of its application. But it applies only to the functions of canvassing and returning officers, which are purely ministerial, and not judicial, in their nature. The same rule does not, however, in my opinion, control the action of a court of justice exercising judicial functions in the determination of cases of contested elections. On the contrary, the same author, in treating of judicial proceedings in such cases, distinctly declares that "it is impossible to define exactly the degree of irregularity and illegality in the

conduct of an election which will render it void; but perhaps the best rule upon the subject is this, if the voice of the electors can be made to appear from the returns, either alone or aided by extrinsic evidence, with reasonable clearness and certainty, then the election should stand, but not otherwise."

While I am not prepared to say that the recorder, acting merely as a returning officer, was justified in accepting either or both of the papers returned by the commissioners of election as a return, in view of their apparent contradictory character, and in absence of any power on his part to explain them by extrinsic evidence, I still think the court had the right to receive such extrinsic evidence as to these documents, for the purpose of establishing their genuineness, their meaning, and their relation to each other.

The evidence received without objection conclusively establishes that these two papers were both prepared and signed by the commissioners of election; that they were returned to the proper officer, at the same time, the one outside, the other inside, the ballot-box; that the latter was taken out of the ballot-box by the commissioners themselves, in presence of the officer in custody thereof, and immediately delivered to him; that its inclusion in the ballot-box was the result of an accident; that the two documents taken together showed the result of the count of the ballots as ascertained by the commissioners, and constituted the return made and intended to be made by said commissioners.

I think it clear that from these returns, thus aided by extrinsic evidence, the voice of the people, as shown and intended to be shown by the return of the commissioners, is made to appear not only "with reasonable clearness and certainty," but with absolute certainty.

I think these returns, thus established and explained, are entitled to the same weight which would be attached to a regular return showing the same result, perfect in form, and complying with all the technical requirements of law.

The effect of the return was to establish a *prima facie* case in favor of the election of the defendant herein, subject to the right of plaintiff herein to impeach the same. In order to overthrow this *prima facie* case by a recount of the ballots in the ballot-box, it was necessary to establish satisfactorily the identity of the box, that it remained in the same condition in which it was at the moment when it passed from the hands of the commissioners, and that its contents had not been altered or tampered with.

This was among the issues submitted to the jury. Voluminous evidence was submitted, full of contradictory and irreconcilable statements of witnesses on either side.

Fraud had unquestionably been committed on one side or the other;

either in the counting and returns of the votes by the commissioners, or in the manipulation of the ballot-box after its delivery by the commissioners. I consider it unnecessary for me to make an original determination of this disagreeable question.

A jury, the fairness of whose composition is not questioned, taken from the vicinage, acquainted with the witnesses, and familiar with all the surroundings of the transactions, determining questions peculiarly within the province of a jury to determine, have rendered an unanimous verdict in favor of the defendant.

I cannot find a sufficient reason in the evidence to justify me in disturbing their verdict.

Mr. Justice Todd concurs in this opinion.

### On Application for Rehearing.

Bermudez, C. J. The majority of the Court seeing no reason to disturb the decree previously rendered herein, it is ordered that the petition for a rehearing herein be refused, and that said decree now become final.

### Concurring Opinion.

Levy, J. On a careful consideration of the application for a rehearing, and after examination of further authorities applicable to the case, I am of the opinion that it was competent for the District Court, on the trial of this contested election suit, to receive testimony going to show or establish the fact that the two papers or statements purporting together to constitute the return of the Leonville box, did constitute the proper return, and that for the purpose of showing this fact extrinsic evidence could be received. I think that the irregularities as to the returns are not fatal and do not justify the exclusion of the votes cast in that box, but that it was competent to resort to a count of the ballots which had been deposited in the box, for the purpose of ascertaining the true voice of the voters, as expressed by the ballots themselves. While the law points out certain formalities to be observed as to the returns of the commissioners, a failure to comply with its directions does not *per se* vitiate the election, and if there are means by which the true vote can be ascertained, such means must be resorted to by the court before which the contest is pending. In this case the irregularities and uncertainties as to the validity of the return of the Leonville commissioners, the doubt arising on their inspection and on their faces as to whether either of the papers was, of itself, an entire return, or whether both together made up and constituted the legal return, justified the introduction of extrinsic evidence to prove the facts in regard to these

returns. If irregularity in the returns or errors of form therein cannot be explained by extrinsic evidence, and irregularity and error are fatal defects, which operate to vitiate the election, it would follow by logical reasoning that when the returns are regular in form they will be conclusive, and, being on their face correct, cannot be attacked. The consequence would be that the voters would be bound by the returns of the commissioners, and bad or corrupt men could with impunity, if they were so disposed, substitute their will, as set forth by their returns, for that of the people, and these returns, being sacramental, could not be attacked or even investigated, either with a view to show their incorrectness through fraud, or otherwise, or on the other hand to establish their correctness, and the right of contest would then be a barren right, from which no remedy could follow. In this case the issues as to the regularity or irregularity of the returns being before the court, the allegations of fraud, error, etc., being also made, and evidence on that score introduced, the court had the right and properly resorted to the means of determining the true vote cast at the Leonville poll by opening the ballot-box and counting the ballots. To justify this, and to entitle the ballots to consideration as evidencing the true vote, it was necessary to prove that the box containing them had not been tampered with, that its contents were the same as when sealed and closed by the commissioners, and the requirements of law as to its custody and preservation had been complied with. The ballots in this box were counted in court in presence of the judge and the jury. This count showed a different result from that set forth in either of the statements or returns, or in the aggregate statements, if construed and taken together, or in the return of the recorder. The question then to be decided was whether the recorder's return, based upon these statements of the commissioners, was the true return of the votes cast at the Leonville poll, and did the ballot-box contain the ballots as cast by the voters at that poll, and had it or not been tampered with. A careful examination of all the testimony satisfies me that the box opened in court contained all the ballots which had been cast on the day of election at the Leonville poll, and none others ; that it had not been tampered with, that the ballots counted on the trial were the ballots as cast by the voters, and that the result of these votes was 145 for Duson and 243 for Thompson, and these being respectively added to the votes received by them at the other polls of the parish, viz.: Duson 2839, Thompson 2713, gave Duson 2984 and Thompson 2956 votes, and Duson was therefore elected by a majority over Thompson of 28 votes. The testimony shows that the box was in the custody of the proper officer and his deputies, and the presumption that officers perform their duty, under the maxim as applicable to them, " *Omnia presumuntur rite acta*," is justified by their positive testimony

that the box had not been tampered with, and that it was produced and
opened in court on the trial of the case just as it was received by them
from the commissioners.   Consideration of all the testimony adduced as
to the identity of the box and absence of interference with the ballots
convinces me on these points. · I cannot allow mere surmises and vague
suspicions, unsupported by positive testimony or substantial facts, to
outweigh the evidence which has convinced me.   While not in any man-
ner assailing the integrity of the jury or the sincerity of their belief in
the correctness of their conclusions on the facts and testimony, and
disposed to accord great weight to the finding of juries on questions of
fact submitted to them, I am still compelled on my own investigation
and consideration of the facts and testimony in the record to differ with
them in my conclusions, but diffidence in that respect is entirely over-
come by the earnest and solemn conviction in my own mind of the cor-
rectness of the views which I have taken.  I, therefore, see no reason
for disturbing the decree of the court rendered herein, and with these
reasons for concurrence in the decree, think the rehearing applied for
should be refused.

The Chief Justice concurs in this opinion.

### DISSENTING OPINION.

FENNER, J.   The doctrines set forth in the opinion of Mr. Justice
LEVY, concurred in by the Chief Justice, touching the power of the
judicial tribunals to receive extrinsic evidence for the purpose of curing
irregularities and formal defects in election returns, and recognizing the
*prima facie* effect of such returns, and touching the foundation to be
laid for their impeachment and for resort to a recount of the ballots,
substantially accord with the views expressed in my dissenting opinion,
and receive my concurrence.

My objections, however, to a reversal of the findings of the jury
upon the questions of fact submitted to them in this case are not re-
moved, and on that ground I maintain my dissent from the decree.

Mr. Justice TODD concurs in this view.

BY THE COURT.   On an intimation of counsel that in the reasons of
the Court overruling the motion to dismiss expressions occur painful to
their feelings, we have, in a spirit of conciliation, taken the pains of re-
viewing the opinion, which was unanimously concurred in by all the
·members of the bench, and correctly announced by his Honor the Justice
· who delivered it as their organ, and find that the language which it con-

tains does not reflect upon the counsel, and is not derogatory to the most fastidious.   Not being offensive, it will undergo no alteration.

---

While on this subject we take occasion to say that verbal suggestions of that character, however respectfully intended and uttered, are irregular, and, in future, will not be entertained.