Lucky et al. vs. Police Jury et al.

## No. 11,377.

L. J. LUCKY ET AL. VS. POLICE JURY OF BIENVILLE PARISH ET AL.

1. Act No. 106 of 1892, entitled "An act to provide for contesting elections held under Articles 209, 242 and 250 of the Constitution of 1879, and the laws to carry the same into effect," is not unconstitutional as violative of Articles 29 and 30 of that instrument.

2. The Police Jury of Bienville parish was properly made a party defendant in the contest of an election held under Act No. 88 of 1892, by citation upon its president.

3. Where the court, from all the circumstances in a particular case and from all the evidence in the record, can reach a conclusion as to what the actual legal vote cast at a particular precinct was, it is its duty to give effect to the vote, notwithstanding the election officers may have been guilty of misconduct in some particular respects. The rejection of the entire returns and the entire vote at a poll for misconduct by the election officials is not by way of penalty or punishment upon the commissioners, or the particular persons or interests to be benefited by the illegal action, but only because in the special case the truth is not deducible from the returns and the evidence. The political rights of the legal voters must be saved if it be possible to do so.

4. Where parties contesting an election place one of the commissioners upon the stand, and through him prove a particular illegal act by the commissioners, which is susceptible of separation from their general conduct and susceptible of special correction, and the same commissioner affirmatively proves (if his testimony is to be taken as trustworthy) that the fact shown was the only one of which complaint could be made, and that otherwise the votes cast were legally cast, and the returns made otherwise correctly showed the vote as cast, the court should limit the remedy to throwing out the votes shown to have been illegally cast and returned. Whether or not the commissioner under such circumstances is to be believed will depend upon all the facts and circumstances of the case and the whole evidence in the record. He is not necessarily

to be disbelieved. Plaintiffs, in placing him upon the stand as their witness, show confidence themselves in his truthfulness. It is very questionable whether the official acts of election commissioners should be permitted to be impeached by the testimony of the commissioners themselves.

APPEAL from the Second District Court, Parish of Bienville.
Watkins, J.

---

*Ben. P. Edwards, W. M. Richardson, Wise & Herndon* and *Jno. A. Richardson* Attorneys for Plaintiffs and Appellants:

A vote may be illegal, because the person casting it may not be qualified to vote at the election, or because it is given at the wrong place, or the wrong time, by a qualified elector, or because it is cast without a compliance with the requisite preliminaries, or because given in an improper manner. Am. and Eng. Encyclopedia, Vol. 6, p. 351 *et seq.*

Fraud on the part of the commissioners of election destroys the presumption of the correctness of the returns, and destroys their value as evidence. Fraud does not invalidate the legal votes cast, but, by destroying the presumption of the correctness of the returns, it makes it necessary that any person who claims any benefit from the votes shall prove them; and where no proof is offered, and the frauds are of such a character that the correct vote can not be determined, the returns of the precinct will be rejected. Am. and Eng. Encyclopedia, Vol. 6, p. 353 *et seq.*; McCreary on Elections, Secs. 472, 488, 391; citing also Knox vs. Blair, 2 Cong. El. Cases, 526; Mann vs. Cassidy, 1 Brews. (Pa.) 11; Morey vs. Spencer, 4 Cong. El. Cases, 447; Washburn vs. Voorhies, 3 Cong. El. Cases, 54; Vallandigham vs. Campbell, 2 Cong. El. Cases, 223.

---

*J. C. Egan, L. K. Watkins, F. P. Stubbs, J. A. Dorman, Drew & Stewart* and *J. E. Reynolds* Attorneys for Defendants and Appellees:

The theory of plaintiffs is that the minority should prevail. The true rule in all republican governments is, that the will of the people as expressed at the ballot box should be ascertained and carried into effect, if possible, from any evidence within the reach of the court.

In the absence of statutory authorization, courts are without juris-
diction *ratione materiæ* to entertain cases of contested election.
"No statute invests the courts of this State with jurisdiction
over contested elections to determine the parish seat." 41 An.
846, State *ex rel.* Woodruff *et al.* vs. Police Jury *et al.* Affirmed
in the subsequent decisions relating to contest over Bossier
court house and parish seat.

Act No. 106 of 1892 is not the required "specific statutory authori-
zation," giving right of contest in this case if the act is uncon-
stitutional, and its unconstitutionality is urged on the grounds—
(a) More than one object is embraced in the act.   (b) Its
objects are not expressed in its title.   (c) It seeks to enact laws
by reference only.   Arts. 29 and 30 of Constitution of 1879; 44
An. 90.

"No officer of a police jury can legally stand in judgment for
the corporation without special authorization." Quoting 38
An. 630, Police Jury of Ouachita vs. City Council of Mon-
roe, and page 704 *Id.;* 33 An. 58. As a canvassing board,
under Acts 88 and 106 of 1892, the whole body must be sued.

A voter must have the qualifications required in Article 185 of Con-
stitution and be registered.   Art. 186, Acts 1876, extra session,
No. 58, p. 94; Acts No. 123 of 1880, No. 101 of 1882.   See Tullos
vs. Lane, 45 An. 333.

The returns of the officers holding the election are *prima facie* cor-
rect, and he who attacks same for irregularity or fraud carries
the burden of proof.

Irregularities in holding an election do not make it a void election,
and the courts, where possible, will correct the returns so as to
show the true result.   32 An. 861, Duson vs. Thompson; 29 An.
610, Weber vs. Wilton; McCrary on Elections, Secs. 483, 539.   No
election shall be vitiated on account of the negligence, illegal or
improper act or conduct of any officer, or other person, unless
it be proved in a contest that a sufficient number of electors
were thereby deprived of their votes to have changed the result
of the election. Act No. 58, extra session of Legislature of 1878,
Sec. 35, p. 96.

If fraud is clearly shown on the commissioners it only makes their
return worthless as evidence.   Contestants in such cases have

682 SUPREME COURT OF LOUISIANA.

Lucky et al. vs. Police Jury et al.

the right to prove by other evidence the true vote cast in the election. Same authorities as above, and see McCrary, Secs. 424, 486.

In such cases evidence sufficient to satisfy the courts of the result is sufficient; no form of proof is required.

The authorities in reference to the prorating of votes (McCrary, Secs. 460, 461) do not apply in this contest, as the plaintiffs have judicially admitted the returns are correct, excepting at the Arcadia and Taylor precincts; and have made the further allegation of their own vote being correct at the other precincts, which can not now be swelled by the court in prorating. Hence unregistered and illegal votes shown by defendant at the precincts in the parish should be taken wholly from the side of the plaintiffs under this judicial admission.

---

The opinion of the court was delivered by

NICHOLLS, C. J. The controversy in this case arose from an election held on the 17th of January, 1893, under the provisions of Act No. 88 of 1892, for the location of a new parish seat for Bienville parish—the towns contesting for the location being Arcadia and Bienville.

Plaintiffs are voters and tax-payers of the parish, living at and near the town of Bienville; the defendants are the police jury of the parish, cited through its president, and the town of Arcadia, cited through its mayor.

On the 19th of January, 1893, the president of the police jury issued a proclamation declaring that Arcadia had, by a majority of sixty-five votes, been selected as the parish seat, and recognizing and announcing that fact.

Plaintiffs contest the election and pray for a judgment decreeing the town of Bienville to have received a majority of the legal votes, decreeing it to be the seat of the parish, and ordering the judicial records, which had in the meantime been taken to Arcadia, to be removed to Bienville.

They recognize that eighteen hundred and sixty-four (1864) legal votes were cast at that election. They contend that of these Arcadia only received six hundred and six (606), whilst Bienville received twelve hundred and fifty-eight (1258), a large majority.

In their petition they furnish a list of the different polling places and of the votes cast at the same in favor of each of the towns, according to their theory of the rights of parties. In so doing, they exclude entirely the votes cast for Arcadia, as shown by the returns from the Arcadia precinct, in Ward One, and at Taylor, in Ward Three; but they retain the votes for Bienville, as shown by the same returns.

The Arcadia precinct returns showed a vote of *six hundred and fifty* for Arcadia, and *three* for Bienville; those of Taylor, *sixty-seven* (67) for Arcadia and *twelve* (12) for Bienville.

They allege that frauds were practised in favor of Arcadia at the Arcadia and Taylor precincts by the commissioners of election or with their connivance to such an extent that the results at those precincts can not be ascertained. That the commissioners thereat made false and fraudulent returns of said election, and that false and fraudulent ballots in favor of Arcadia were deposited in the ballot boxes at those precincts by the commissioners or with their connivance and consent, all of which were counted and returned as legal votes in favor of Arcadia; that for these reasons the ballots and returns at those precincts should be rejected and disregarded, but if they should not be entirely rejected then petitioners alleged that at least two hundred persons were permitted to and did vote at Arcadia at said election who were ineligible on account of some being non-residents—some minors, others not being registered, and others not being present to cast their votes; and at the Taylor precinct there were at least twenty-five ballots put into the box for persons not present to cast their votes, a sufficient number to change the result, and the commissioners who received said votes acted wrongfully and fraudulently, well knowing they were not legal votes, and had they been rejected the result would have been in favor of Bienville. That said illegal ballots were wrongfully and fraudulently counted and returned for Arcadia. They further allege that Bienville received a large majority, at least six hundred and forty-four of the legal voters cast at the election and is the choice of the electors of the parish, and should be so adjudged.

That acting alone on the face of the returns made by the commissioners of election to the police jury (which returns included the false, fraudulent and illegal ballots returned from Arcadia and Taylor precincts), the president of the police jury issued and caused

to be published a proclamation declaring that the parish seat of Bienville parish was removed from Sparta to Arcadia.

That this proclamation was issued and published without authority of law, but that none the less the clerk and sheriff had obeyed the proclamation and had removed the records and property of the parish to Arcadia, and that the town of Arcadia claimed to be the parish seat under the said election—a claim unfounded in law and equity.

The president of the police jury filed exceptions to the petition to the effect: (1) That Act No. 106 of 1892, providing for contests of election of this character, requires the police jury to be the defendant, and service to be made on the police jury or other body or authority holding the election; that the police jury is a political corporation created under the laws of the State and can only act in the mode prescribed by law, and that he as president of the body did not represent it and could not stand in judgment for it without special authority, which had not been given him in this case; (2) that the suit should be dismissed for the reason that there is no defendant in the case, the statute declaring that it should be brought against the police jury.

In the event these exceptions should be overruled, he then excepted that it would be impossible to answer the petition under its general and indefinite allegations; that it charged fraud on the commissioners of two boxes, but did not state which of them had done so nor the act which constituted the fraud; that it charged that there were illegal votes cast at the Arcadia and Taylor precincts, but did not give their names. That the petition should have given the names of every person claimed to have illegally voted, and a statement of the facts which made them so. That without specifications of names and of facts, and a statement of the nature of the fraud perpetrated by each commissioner and voter, the issues could not be fairly and properly tried.]

He prayed for the dismissal of the suit on the exceptions.

The mayor of Arcadia excepted that the court was without jurisdiction *ratione materiæ* to try the case for the reason that *Act No. 106 of 1892*, under authority of which it was instituted, was unconstitutional and void.

1. Because more than one object is embraced in the act.

2. Its objects are not expressed in its title.

3. It seeks to enact laws by reference only.

The court ordered the plaintiffs to amend their pleadings " so as to state explicitly the acts of fraud, etc., complained of, and to make such other allegations not exclusive of or in conflict with their original allegations as might be necessary to authorize the introduction of their evidence, and make them as full as it is claimed is required by McCrary on Elections, pp. 264 and 265, sections 400 and 402 inclusive, and overruled the other exceptions.

In the amended petition which plaintiffs filed under this action of the court they charged that three commissioners at the Arcadia precinct (naming them) illegally and fraudulently put into the ballot box at that precinct, at that time, or permitted the same to be done with their connivance and consent, more ballots or tickets than there were names on the check list of persons named as voting to the number of at least fifty-two. That they allowed persons to vote who were not registered and legally entitled to do so, or who were minors or who were non-residents, to the extent of six hundred and fifty votes; that the list of the persons allowed to vote as above alleged is shown by the certified list of names of the persons claimed to have voted annexed to their supplemental petition. That at the Taylor box, the three commissioners (naming them), after the polls had been opened and the election proceeded with for one hour, permitted one A. J. Colbert to go inside of the room with said commissioners, and to participate in and control and manage the said election, and that the said commissioners and Colbert did put into the box sixty-seven ballots for persons who were not present to cast their votes, the list of the persons thus put into the box being shown by the certified list of names annexed.

Defendants filed an original and subsequently an amended answer. After pleading the general issue defendants attack the commissioners at the precincts of Driskell, Gibbsland, Bulah, Bienville, Sparta, Lanhorn, Ringgold, Prothro, Castor, Liberty Hill and Friendship, and many of the votes cast at these precincts, alleging fraud on the part of the commissioners, and minority, absence, want of registration, etc., on the part of the voters, also naming certain votes as having been cast for Arcadia and not counted, also alleging that no tally was kept at Union Church and Lanham, and that a certain colored club of twenty-two members had been bribed to vote for Bienville.

The town of Arcadia, through its mayor, excepted that it had been improperly made a party, and prayed that the suit as to it be dismissed.

The District Court rendered a judgment in favor of the defendants, rejecting plaintiffs' demand and dismissing the suit at their costs They have appealed.

We are of the opinion that the exceptions taken asking the dismissal of the suit for the reason that "there is no defendant in the case, as the statutes have declared that such a suit should be brought against the police jury, and it had not been so brought, as the president of the police jury upon whom service was made had no authority to represent the police jury without special authority to that effect, which authority he had not been given in this case," was correctly overruled.

The suit brought is not to mandamus the police jury or its members to do some act, but to annul and undo what it has declared and pronounced well done under the powers granted it in the matter of the special election held.   Under the law the suit had to be brought against the police jury—which body is called into court as a defendant through citation upon the president.   The authority to represent the police jury when sued in this class of cases is to be found in the State law, and is not dependent upon action to be taken by the body itself.

The exception taken to the jurisdiction of the District Court on the ground that Act No. 106 is unconstitutional is not well founded.

The title of the act is "An act to provide for contesting elections held under Arts. 209, 242 and 250 of the Constitution of 1879, and the laws to carry the same into effect."

The act in question was enacted by reason of the decisions of this court holding that the judiciary was without power to pass upon contests raised in regard to elections held under the articles of the Constitution mentioned in the absence of special legislation granting authority so to do.   Its object was to provide for such contests through suits and to establish a uniform rule governing them all. The body of the act fairly conforms to the title, and the title discloses sufficiently fully its scope and purpose.   The fact that several different kinds of special elections may fall under the operation of the statute does not break the unity or singleness of its object.

The district judge in referring to the third branch of this excep-

tion, which was to the effect that the passage of the statute was an attempt to enact laws by reference to the title of other laws, correctly states that "when Art. 30 of the Constitution provided that no law shall be revised or amended by reference to its title it was no doubt intended to be restricted to the revisal and amendment of laws already passed, and not to be extended to the passage of original laws making operative those articles of the Constitution which were not self-operating."

The judgment of the District Court evidences great labor, patience and industry. Annexed to it, as part of it, are original memoranda of the judge, contained in sixty-four pages, showing which of the voters were rejected and which not, and giving, in the first column, the registration numbers; in the second column, the names of the voters arranged in alphabetical order; *in the third column*, the pages of the evidence in respect to each; in *the fourth column*, the names of the witnesses; in the fifth, the substance of the evidence, and in the sixth, remarks.

The correctness of the conclusions of the judge in respect to the individual voters does not seem to be questioned, the contest really turning upon those reached by him in respect to the actions of the commissioners at the Arcadia and Taylor boxes. Plaintiffs contend and maintain that the entire vote at both of these precincts should be thrown out by reason of fraud on the part of the officials at the boxes.

Relative to the Taylor box, the judgment makes the following statements: "The first witness introduced (by the plaintiffs) was Thomas Crow, one of the commissioners at the box. His evidence shows that four persons whom the commissioners considered to be qualified voters at the Taylor precinct had failed to come to the election, and just before the polls closed the commissioners put four ballots in the box for these four absentees. He and two other commissioners swear that they intended no fraud, but knew how the absentees wanted to vote and put their ballots in for them, as was customary at primary elections. Of course these ballots (being for Eugene Clayton, Bill Speck, Charlie Grimes and Davis Richardson) are not legal—they were cast and counted for Arcadia and will have to be deducted from Arcadia's vote. The real serious question to be determined is, shall the entire box be thrown out? Each of the witnesses—Messrs. Crow, Colbert and Nelson—are so well and favorably

known by the court, their standing is so high in the community as honorable men, that I should be loath to impute fraud to them. But the plaintiffs have placed Mr. Crow upon the witness stand, and thus vouch for his truthfulness. He says he intended no fraud, and the evidence shows that there was no effort at concealment. While their act was illegal and wrong, the other voters, who are shown by the witnesses to be legal voters, voting at that box, should not be deprived of their votes by casting out the entire box. All the votes cast at Taylor, except those four, are fully proven to be legal, and are counted."

The Arcadia box is thus referred to: "It is sought to be thrown out on account of the frauds claimed to have been committed by the commissioners. Without specific allegations, they were permitted, under the legal rules laid down by the courts in the trial of contested election cases, to introduce proof to show that one of the commissioners stuffed the ballot box—that persons were allowed to vote who lived in Union, Lincoln, Claiborne and Natchitoches parishes; that one at Minden, one at Gibbsland, and others at other places, voted by proxy; that men were allowed to vote more than once; that dead men voted, and that fifty-two more ballots were in the ballot box at the close of the election than there were names on the list of those voting. Having thrown the doors wide open, all the evidence went in."

The judgment then proceeds, after an analysis of the testimony given in respect to each of the matters charged, to sustain some of the contests made, to dismiss others and to explain various matters which are attacked as suspicious and fraudulent, and declares: "This makes a total of thirty–nine votes cast out at the Arcadia box, which, with four cast out at Taylor, makes a total of forty-two votes for Arcadia to be taken from the sixty-five majority received, and leaves twenty-three majority for Arcadia, not taking into consideration the eleven illegal, unregistered votes cast at Driskell, six at Gibbsland, one at Bulah, six at Sparta, thirteen at Lanhorn, ten at Ringgold, five at Prothro and three at Liberty Hill, at all of which places the larger proportion of the vote should be deducted from Bienville, except at Ringgold. There were several illegal votes shown to have been cast for Bienville besides those above, which are designated on the memorandum as not registered, but it is useless to enumerate them, for if the Arcadia box is to be discarded the result will be in

favor of Bienville, and if the Arcadia box is to be counted Arcadia will have the majority, whether the contention as to Union Church and Gibbsland be sustained or not.

" There is only a difference of two votes claimed to be shown between the vote as cast and as retnrned at Union, and I can not decide sufficient fraud to throw that box out. The indications are very strong that the club of twenty-two at Gibbsland were bribed (so charged to be by defendants), but the evidence is not sufficiently strong. The same might be said as to the ballot box stuffing at Arcadia. All the commissioners deny it; but if it were true, the legal voters ought not to be deprived of their votes on this account. The fifty-two votes complained of were all thrown out. No one was prejudiced by them. It does not make any difference how they got in the box. Being in the middle or at the bottom of the box, it does not seem plausible that they were put in there late in the day. The over-zealous voters must have slipped them in there with their ballots folded separately."

Plaintiffs rest their attack upon the integrity of the Taylor box precinct returns upon the testimony of Thomas Crow, one of the commissioners at the box whom they placed upon the stand and examined as witness over the objections of the defendants, that, as a public officer, who had made an official report, he could not be permitted as a witness to impeach it. From this witness was elicited the fact mentioned in the judgment of the District Court, that four tickets had been improperly and illegally placed in the ballot box and counted by the commissioners.

The plaintiffs maintain in this court, as they did in the lower court, that the consequence of this act was to necessarily carry with it the rejection of the RETURN *in toto* and the *rejection* of the ENTIRE VOTE at the precinct. It has undoubtedly been held in many cases where the managers of an election have been clearly shown to have committed a fraud in the conduct of the election, or the counting of votes, and the returns clearly shown to be wilfully and corruptly false in any material part, that the whole of it becomes worthless as proof, and the entire poll must be rejected. McCrary on Elections, Secs. 184, 185 and 302, cites authorities to that effect, but the same author, in Section 368, says: " To set aside the returns of an election is one thing, to set aside the election itself is another and very different thing. The return from a given precinct being set aside,

44

the duty still remains to let the election stand, and to ascertain from other evidence the true state of the vote. The return is only to be set aside, as we have seen, when it is so tainted with fraud or with the misconduct of the election officers that the truth can not be deduced from it. The ELECTION is only to be set aside when it is impossible from *any evidence* within reach to ascertain the true result—when neither from the returns nor from other proof, nor from all together, can the truth be determined. It is important to keep this distinction in mind.   *   *   *   The question under what circumstances the entire poll of an election district may be rejected has been much discussed, and conflicting views have been expressed by the courts.

" The power to reject an entire poll is certainly a dangerous power, and though it belongs to whatever tribunal has jurisdiction to pass upon the merits of a contested election case, it should be exercised only in an extreme case—that is to say, a case where it is impossible to ascertain with reasonable certainty the true vote. It must appear that the conduct of the election officers has been such as to destroy the integrity of their returns and to avoid the *prima facie* character which they ought to bear as evidence before they can be set aside as evidence and other proof demanded of the true state of the vote (Sec. 303). "Undoubtedly the general rule is that if legal votes have been cast in good faith by honest electors it is the duty of the court or tribunal trying a contest to ascertain their number and give them due effect, notwithstanding misconduct or even fraud on the part of the election officers. Such fraud or misconduct may destroy the value of the officer's certificate, and may subject him to severe punishment, but the innocent voter should not suffer on that account if by any means his rights can be upheld (Sec. 304). The general rule is that the ordinary rules of evidence apply as well to election contests as to other cases (Sec. 306)."

The difficulty in matters of election contests is not so much in the principles governing them as in the application of these principles to particular cases.

In the one before us an unwarranted, illegal act on the part of the commissioners at the Taylor precinct has unquestionably been es-tablished—established, however, by the commissioners themselves as witnesses upon the stand. But whilst the special fact referred to is brought out through the commissioners, these same commissioners

establish affirmatively that in all other respects the election was fairly conducted, and that the returns evidence correctly the legal vote at the poll. We have reached on this subject the same conclusion which the district judge did. The rejection of the entire returns of a poll, and of the entire vote cast thereat, by reason of the misconduct of the commissioners, is not by way of punishment of the commissioners or of the particular persons or interests to be benefited thereby, but because the court has reached the conclusion that the truth can not be deducible from the returns, and the will of the voters can not be ascertained. If the court reaches the conclusion that the actual vote can be ascertained, it is its duty to give effect to it and save the innocent voters from the loss of their political right to be heard.

Plaintiffs contend that it is absolutely inconsistent in the court to give any weight whatever to the testimony of commissioners who have been shown to have been guilty officially of an illegal act; and where it has thrown out votes by reason of such illegal act, but in this they are mistaken. Whether or not the commissioners are to be believed under oath as witnesses when some particular act done by them is clearly illegal and their return, by reason of this act, is attacked and thrown under suspicion will be dependent upon the entire circumstances of the case and the whole evidence in the record. The commissioners in this case acted utterly unjustifiably in drawing a distinction between a special election held for a particular purpose and a general election held for selection of officers, in assimilating such an election to a party primary election and in following at the poll the practice at that poll of depositing votes for absent legal voters whose views were known and whose manner of voting, if present, had been ascertained. Such a practice is reprehensible at a primary, even if sanctioned by consent, and totally inadmissible in an official election held under the law.

In Thompson vs. Ewing, 1 Brewst. 107 (McCrary, Sec. 303), it was said " that the whole conduct of election officers may, though actual fraud be not apparent, amount to such gross and culpable negligence, such a disregard of their official duties, as to render their doings unintelligible or unworthy of credence, and their action entirely unreasonable for any purpose." But we do not find in this case, as a matter of fact, such a condition of things. We are satisfied that the only wrongful act done was the depositing of the four votes men-

tioned, and that the district judge in his action correctly limited the remedy to throwing out those particular votes.

The precinct was a small country precinct, where doubtless every voter and the views of every voter were well known. The pleadings make a direct general attack upon the whole conduct of the election, and yet no attempt was made to sustain these sweeping allegations. The poll books, the tally sheets and the returns were all introduced in evidence.

The commissioners were placed upon the stand and proved up the exact vote, admitted freely and without hesitation what they had done, explained how and why they had done it, and, as we have said, showed affirmatively that the particular act was the only one which could be complained of. We do not think that they imagined that these four votes would have the effect of altering the general result of the election and we do not think that intentionally and wilfully they committed a fraud. The district judge knows the parties and thinks them incapable of it, and the plaintiffs themselves in placing Mr. Crow upon the stand show they had confidence in his veracity. On the whole we think the popular will at the Taylor precinct has found expression through the action taken in the District Court.

The conclusion we have reached in the case, on the assumption that the testimony of the commissioners was legally taken, renders it unnecessary to pass directly upon the important question raised by the defendants' bill of exceptions as to the right of the plaintiffs to impeach the returns through the testimony of the commissioners themselves. The rule has been in this State to require official misconduct, which has been alleged as the basis for the setting aside of official action, returned and certified to, to be established by parties other than the officers themselves. The decisions on the subject refer principally to sheriffs, notaries, and to members of the jury.

We know of none and have been referred to none touching this particular class of officers. We know of no reason which would go to the exclusion of notaries, sheriffs and jurymen for the purpose stated which would not be equally applicable to commissioners of election, and do not see any good ground for making an exception as to them. Such is our present view of the matter, but we prefer to leave it as an open question.

So far as the Arcadia returns are concerned, we adopt the con-

clusions of the district judge.   The attack upon the integrity of one
of the commissioners at the box at that precinct is utterly unsus-
tained.   It rests practically upon the testimony of one witness,
whose testimony is negatived by that of a number of persons who
were directly on the spot, and who affirmatively swear to the non-
existence of the facts stated by this single witness.   The commis-
sioner himself, under oath, positively denies the facts sworn to; the
other commissioners and the clerk of election (against the propriety
of whose conduct in the particular matter there is not a scintilla of
evidence) sustain the testimony of the commissioner who is charged
with misconduct.   Brown, who is claimed to have lent himself to
the perpetration of the fraud by masking the ballot box temporarily
from the view of outsiders, emphatically denies having done so, or
of hearing any such words spoken by the commissioner as the wit-
ness mentioned states that he used.

His testimony on that point is supported by all the parties who
were inside the voting room.   It is strange had the commissioner
made use of the language attributed to him that only one person
should have heard it, and still stranger that the language itself
should have been so openly used.   The failure of the witness to at
once complain of the act which was afterward set up as a ground for
a rejection of the returns, and his keeping silence as long as he did,
are circumstances which we have had also to consider.   In addition
to the number of witnesses arrayed against the charge made—wit-
nesses whose credibility has not been impeached—the plaintiffs are
met by the presumption which the law itself attaches in favor of the
correctness and honesty of official acts.   We do not see how, under
the testimony as well as under this presumption, it was possible for
the district judge to reach any other conclusion than he did on this
particular point.

We have spoken of the charge as being sustained by the testimony
of only one witness; we mean by that to say that we attach no
weight to the testimony of Bullard.   His testimony, in the first place,
differs materially from that of the person whose testimony he seeks
to corroborate.   His character for veracity was attacked, and though
supported by several witnesses, the fact is before us, in addition to
other facts, that this witness voted illegally himself at the Arcadia
precinct, upon an affidavit which we find in the record.   There were
a number of illegal votes cast at the Arcadia box; the district judge

has thrown them out. We have no reason to suppose the commissioners to be chargeable with the casting or the counting of those votes.

There were fifty-two more ballots found in the box when the count was made than there were names of persons voting. These ballots resulted from the folding of several tickets together, and the depositing of them in that way in the ballot box. They were not in one particular place, but scattered throughout the box. They were at once rejected on being discovered, and not attempted to be counted. The explanation given of the presence of these ballots in the box is that the tickets were printed on thin paper, and were in bundles of some thickness, the tickets adhering more or less to each other, and that occasionally some voter not noticing the fact would take off two or more, fold them and deposit them in the box as their vote. Two witnesses were produced who stated that they had themselves only accidentally discovered just before voting that the folded ticket which they were about to deposit contained not one, but several tickets. The attention of one of these witnesses was drawn to the fact by the commissioner whose integrity is impugned.

There was no objection made to the presence of others than the commissioners at the count. Two persons were present who were there specially for the purpose of seeing that it was fairly made and in the interest of Bienville. The votes were taken out and announced by Dr. Baker, in whose integrity both sides seem to have had and still have confidence. It could scarcely have been contemplated that a fraud could be successfully perpetrated through folded double ballots when an open count through disinterested parties was to be made. The fraud was bound to be discovered and bound to avail nothing.

The record in this case is one containing between one and two thousand pages; the testimony as to particular facts and as to particular persons is necessarily scattered. We have bestowed upon it our best attention, and we feel satisfied that the judgment must stand. We do not think it necessary to enter more minutely than we have done into the details of testimony relative to the charge of stuffing the ballot box at Arcadia. There are reasons other than that which we have mentioned which influence us in reaching our conclusions; but these, in our opinion, were sufficient. For the reasons herein stated it is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby affirmed.