102 So.2d 755 (1958)
235 La. 62
Richard A. DOWLING
v.
ORLEANS PARISH DEMOCRATIC COMMITTEE and Malcolm V. O'HARA.
No. 44006.
Supreme Court of Louisiana.
March 20, 1958.
Opinion April 21, 1958.
*756 Clarence Dowling, J. David McNeill, Dorothy D. Wolbrette, Joseph Bossetta, Gaspar Bossetta, John P. Dowling, Richard McBride, Malcolm Mundy, Jr., New Orleans, for appellant.
Byrnes & Wallace, Bernard J. Fonseca, Alden W. Muller, New Orleans, for appellees.
FOURNET, Chief Justice.
In compliance with the provisions of R.S. 18:364, requiring disposition of cases of this character within twenty-four hours after submission, we herewith hand down our decisionthe reasons for which will follow in due course.
The judgment of the lower court is annulled and set aside, and it is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Richard A. Dowling, and against the defendants, Malcolm V. O'Hara and the Orleans Parish Democratic Committee, decreeing that the plaintiff, Richard A. Dowling, has received a majority of the votes legally cast in the second primary election held in New Orleans on February 25, 1958, and accordingly is the nominee of the Democratic party for the office of District Attorney for the Parish of Orleans. Defendants to pay all costs.
HAMITER, J., dissents, being of the opinion that the holding of another second primary should be ordered.
*757 HAWTHORNE, J., concurs in part and dissents in part and will assign written reasons.
McCALEB, J., concurs in the reversal of the judgment but dissents from the ruling that contestant is Democratic nominee and will assign written reasons.

Opinion
FOURNET, Chief Justice.
The plaintiff, Richard A. Dowling, having qualified as a candidate for the Democratic nomination for the office of District Attorney for the Parish of Orleans in the Democratic primary held on February 4, 1958, and received the second highest number of votes, was one of the two candidates in the second primary election for that office held in New Orleans on February 25, 1958, as a result of which his opponent therein, Malcolm V. O'Hara, was certified as the Democratic nominee by the Orleans Parish Democratic Committee; and has instituted suit to contest that election, alleging that he, plaintiff, received a majority of the legal votes cast and is entitled to be the party nominee in the forthcoming General Election, in that all of the 232 absentee ballots cast in the second primary (105 for plaintiff and 127 for O'Hara) were void ab initio because the Legislature has failed to provide a method by which absentee voting can be accomplished where voting machines are used, no provision having been made for ballot boxes wherein the absentee ballots "shall" be deposited;[1] and the elimination of those ballots would leave a majority in his (plaintiff's) favor of 9 votes in the case of the tabulation of the Orleans Parish Democratic Committee, and 13 votes in the case of the totals obtained from the voting machines by the Parish Custodian of voting machines;[2] that the method used by the commissioners of election in the second primary to record said absentee votes, i. e., opening the envelopes, unfolding and examining the ballots, and recording them on the tabulation sheets as indicated by the vote, destroyed the secrecy of the ballot as provided for in the Louisiana Constitution, Article 8, Section 15;[3] if this Court should hold that such procedure is the method intended by the Legislature, then Act 415 of 1952 (providing for absentee voting) is null and void because violative of the same provisions of the Constitution; and that timely protest was made before the Orleans Parish Democratic Committee of the "void" absentee votes, but to no avail. In the alternative it is alleged that on the day of the election, frauds and irregularities were committed by the commissioners of election throughout the City of New Orleans, particularly in certain named precincts of certain wards, in that (a) names of persons who did not personally appear in the polling places were placed on the poll list, and votes were actually cast through the voting machine; (b) that persons were allowed to vote without the necessity *758 of signing the precinct register; (c) that signatures which are questionable and which are apparently not the signatures of the persons registered appear on precinct registers; and (d) that a system of fraud has been developed whereby a voter is required to place his signature on the precinct register without the commissioner writing on said register the date that the signature was so placed, as required by law (R.S. 18:256), thus leaving the door open to the casting of unlimited fraudulent votes; and that "such irregularity and fraud are of such a nature and in such quantity that the result of this election would be materially changed if such illegal and fraudulent votes were eliminated."
It is further alleged, with particularity, that in Ward 17, Precinct 13where there was no commissioner representing the plaintiff and all commissioners were of the O'Hara factioncertain named persons, 59 in number,[4] whose names appear on an attached photostatic copy of the poll list, were shown as voting on February 25, 1958, but the permanent precinct register contains no entry of a date showing that the said persons voted on that day, and that "the number of undated entries in the permanent precinct register for the election of February 25, 1958, is so excessive, and the indication of fraudulently cast votes [is] so strong, that the court should disregard the returns of the entire precinct;" in the Third Precinct of the Second Ward, there appears on the poll list the names of 17 persons who did not sign the precinct register and there appears on the voting machine 17 more votes than there are signatures on the precinct register; that two other named persons did not go to the polls and did not vote on February 25, although an entry was made in the permanent precinct register indicating that those two persons appeared and cast their votes; that certain other entries on the precinct register are irregular and illegal either because of want of date or commissioner's signature, signature of the voter, or not the genuine signature of the person; that all commissioners were from the faction supporting O'Hara and plaintiff was unrepresented, or if committed at a time when plaintiff was represented, the fraudulent acts were done surreptitiously, so that there was no opportunity for detection. Plaintiff asserts that these illegal votes should be subtracted from the total votes received in that precinct by O'Hara. The same irregularities are alleged in the Third Precinct of the Tenth Ward; and in the Thirteenth Precinct of the Tenth Ward there is the additional allegation that "somebody was permitted to vote after placing this questionable signature on the precinct register because the name of the registered voter is included in the poll list." It is alleged that in the First Precinct of the Third Ward, the commissioners voted two absentee votes through the voting machines and in addition thereto added the same two votes to the tally sheet as absentee votes; "that the action of the commissioners was protested by a watcher and supporter of your petitioner, and that the said commissioners in said precinct laughed at and ignored such protest." In the Twelfth Precinct of the Fifth Ward, where all of the commissioners were supporters of O'Hara's political faction, "a commissioner went into the voting machine and voted twelve illegal votes all in favor of * * * O'Hara; that said votes were voted in the names of various persons who are registered voters *759 in said Ward and Precinct but who failed to appear in person * * * to vote * * *." In the Sixth Precinct of the Second Ward, the plaintiff alleged that a duly registered and qualified voter presented herself to vote, and upon having difficulty with the mechanical operation of the machine called one of the commissioners, and he, after correcting the difficulty, then and there voted in said machine for O'Hara, but upon protest from the voter, permitted her to vote, which she then did in favor of plaintiff; but this served only to nullify the illegal vote cast for O'Hara and deprived plaintiff of one vote. There is the additional allegation, with respect to Ward 7, Precinct 1, that while the poll list shows the names of certain persons, 29 in number (shown on an attached photostatic copy of the poll list) as having voted in the election of February 25, those persons did not vote, "but some person or persons unknown to your petitioner voted the said persons `from the book,' illegally entered their names in the poll list of said precinct and caused said votes to be recorded on the voting machine;" and that the votes cast in the names of the persons listed should be declared illegal and invalid and the number subtracted from O'Hara's total.[5] Lastly, it is alleged that either a vast majority or all commissioners who served were supporters of O'Hara or his political faction[6] and therefore any irregularities committed by the commissioners or through their connivance were committed against plaintiff and in favor of O'Hara. The prayer is for judgment decreeing that the Legislature has failed to provide a method by which absentee voting is permitted where voting machines are used, that therefore the plaintiff received a majority of the votes cast in the second primary election, and is the nominee of the Democratic Party for the office of District Attorney; in the alternative, for judgment declaring that there were sufficient frauds committed by commissioners supporting O'Hara or his faction to determine that without those frauds the plaintiff would have received a majority and would be the Democratic nominee. In the further alternative, the prayer is that the election be declared a nullity and that this Court order the Orleans Parish Democratic Committee to call a new election forthwith for the nomination of the Democratic Party to the said office.
The answers of the defendants were a general denial, with further averments, on the part of the Orleans Parish Democratic Executive Committee, that no fraud or irregularity was alleged on the part of an officer or member in the performance of his duty of tabulating and compiling the returns of the election; that its full legal duty *760 has been performed, and it is without authority to call another primary election; and that therefore it was improperly joined as party defendant and suit as to it should be dismissed. Both defendants assert by special plea that since plaintiff was a candidate in the first primary election held on February 4, 1958, but failed to contend that the method of casting or counting absentee ballots was illegal or unconstitutionalin fact, profited by having included the absentee votes cast for himand well knew that the same method would be followed in the second primary, he must be considered as having acquiesced in the method of casting and counting absentee ballots and is estopped from urging illegality and unconstitutionality of the law applicable to absentee voting and also estopped from complaining of the procedure and method employed in the appointment of commissioners used at the polling places to assist in the recordation and tabulation of the votes cast in the second primary election.
Trial was had on the merits, in the course of which the Court restricted proof of fraud and irregularities to the number of 17 fraudulent votes alleged to have been cast in the Third Precinct of the Second Ward; and the defendants having declined to offer any evidence and having rested their case immediately following the plaintiff's presentation, the trial judge ruled, with respect to the argument that the secrecy of the ballot had been violated, that if there is secrecy at the time the absentee ballot is preparedin this case, in the Civil Sheriff's officethen the fact that the ballots are identifiable at a later time, and the further fact that the commissioners did not place them in a ballot box, does not invalidate those absentee ballots; with respect to charges of illegality and fraud, he observed: "The court is convinced that there are substantial irregularities in the Third Precinct of the Second Ward, and the court believes that seventeen such irregularities were proved beyond peradventure; the court believes that there was proved forgery of two signatures, and the court believes that the other parties who testified, nine or ten in number including the forgeries, did not vote in that precinct on that date, and the court is convinced there were substantial irregularities in that precinct;" but ruled that the law requires not only that irregularities, if proved, would change the result of the election, but places the burden on plaintiff to show that but for these irregularities he would have been elected, and refused to subscribe to plaintiff's argument that, all commissioners in the Third Precinct of the Second Ward having been of the opposing faction, the court should deduce that the 17 irregular votes were cast against the plaintiff Dowling, observing that "The law does not permit this court to indulge in any such presumption." Accordingly, the plaintiff's suit was dismissed, and he has appealed.
In this Court counsel for plaintiff is again urging, primarily, that the absentee ballots were void ab initio, or, in the alternative, were illegal; and in the further alternative, he bases his case on these arguments: (a) the trial judge having found that 17 fraudulent votes were cast in one precinct, circumstantial evidence is admissible to prove how those illegal votes were cast, and it shows (to the exclusion of every other reasonable hypothesis) that they were cast for O'Hara, so thatO'Hara's majority having been only 9 votesjudgment should be rendered decreeing plaintiff to have received a majority of the legal votes cast and to be the nominee of the Democratic Party; (b) the trial court erred in confining the proof narrowly to the specific allegations of plaintiff's original petition and should have allowed amendment before trial to exemplify and particularize the original allegations (which in no way would have delayed trial on the merits) and admitted evidence of the facts and matters alleged in the amendments; (c) that the alleged (Article 24 of original petition) and proved system of irregularities in the Thirteenth Precinct of the Seventeenth Ward showed that commissioners allowed persons to vote without complying with the *761 mandatory provisions of R.S. 18:256, that such votes, 57 in number, should be deemed illegal, and since they were sufficient in number to change the result, the primary should be annulled and a new election ordered.
There is much substance in plaintiff's alternative initial argument (i. e., in the event we should fail to hold void ab initio the absentee ballots cast in the second primary because of failure of the Legislature to provide for ballot boxes) that the method provided by the Legislature for casting of absentee ballots (R.S. 18:258-260), when used in connection with voting machines, violates the purpose of the constitutional provision decreeing secrecy of the ballot. Under existing absentee voting law, "The commissioners having observed and found the ballot to be regular as far as can be observed from its official endorsements, a commissioner shall deposit it in the proper ballot box" "without it being unfolded or permitted to be unfolded or examined" (R.S. 18:259); but under present procedure in localities where voting machines are used,[7] there being no ballot box, after the envelope containing the absentee ballot is opened in the presence and view of bystanders and the commissioners supporting opposing candidates, as required by law, and after the signature on the application is compared with the signature on the back of the envelope and on the voter's registration certificate in the precinct register and found to be genuine, if the applicant has not appeared in person and voted at the election, the ballot is unfolded, examined, and tabulated by the commissioners to the benefit of the candidate voted for; and each and every absentee ballot is thus identifiable. It is obvious that with such procedure the secrecy of the ballot is meaningless. Appropriate here because the Court was considering a case which involved voting procedure similar to that prescribed for absentee balloting[8] are this Court's observations in a case where an election was decreed set aside due to failure to print and use the official ballot required for primary elections: "The purpose of these provisions is to make effective one of the main objects of the Primary Election Law, and that is that the voter shall be permitted to cast his ballot Whereas, if it were possible for any one else knowing how he voted; the idea being that, in these circumstances, he would come nearer voting his true convictions. Whereas, if it were possible for anyone else to know, or have a check upon how he voted, an improper influence might be thereby exercised upon his choice. * * *" Hart v. Picou, 147 La. 1017, at page 1021, 86 So. 479, 480. The Court further noted in that case that, as the election had been conducted, the way was left wide open for fraud, stating that (since none was proved) "it is not a question of the proof of fraud, but of the possibility of its being committed, that the law maker intended *762 to guard against." With these considerations in mind we are impelled to remark that the absentee voting law as written, when adapted to use with voting machines, in addition to exposing the voter to intimidation and other forms of reprisal, presents a ready-made pattern for vote fraud, such as vote buying, and constitutes such a serious situation that the matter addresses itself to the Legislature for prompt correction at its next session.
However, the question of constitutionality as raised by the plaintiff is pretermitted, as we prefer to base our decision on other grounds. The conclusion we have reached is consonant with purity of the ballot, and the only course to insure honest elections and to serve as a deterrent to similar actions in future elections. We therefore pass to the matter which is determinative of the case, i.e., the alleged fraud and irregularities committed by the commissioners of election.
As a general proposition it may be stated that, in the absence of specific facts giving rise to fraud or which cast uncertainty on the result, irregularities in an election will not affect the validity of a nomination or serve to nullify the result (Daigle v. Mayor and Board of Aldermen of Town of Rayne, 222 La. 556, 62 So.2d 833; Womack v. Nettles, 155 La. 359, 99 So. 290; Andrews v. Blackman, 131 La. 355, 59 So. 769); but the rule is otherwise if a contestant is able to show, upon allegations of specific fraud and irregularities, that but for such fraud and irregularities he would have received a majority of the legal votes cast (Landry v. Ozenne, 194 La. 853, 195 So. 14; Lafargue v. Galloway, 184 La. 707, 167 So. 197); and, as an alternative, it has been recognized that if the Court finds the proven frauds and irregularities are of such a serious nature as to deprive the voters of the free expression of their will, it will decree the nullity of the entire electioneven though the contestant might not be able to prove that he would have been nominated but for such fraud and irregularities (Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292; Vidrine v. Eldred, 153 La. 779, 96 So. 566). Clearly, the elimination of the total votes cast in the specific precinct or precincts wherein irregularities and fraud were found would be tantamount to the disfranchisement of every voter in that precinct and might defeat the will of the people (State ex rel. Burg v. Folse, La.App., 17 So.2d 32; Dumestre v. Fisher, La.App., 195 So. 25); on the other hand, where the ballots cast by the illegal voters can be identified, they should of course be rejected, the true rule being that the first effort should be to purge the poll by proving for whom the illegal votes were cast, and thus ascertain the real vote; if the true result can be ascertained by eliminating the illegal votes, the election will be upheld (29 C.J.S. Verbo Elections § 219, p. 322); it follows that where it is possible to separate the illegal votes and show for whom they were cast, they will be deducted from the total of the person for whom they were counted, and the court will give effect to the will of the voters and declare the nominee to be the one who received the most legal votes (Lucky v. Police Jury of Bienville Parish, 46 La.Ann. 679, 15 So. 89; McKnight v. Ragan, 33 La.Ann. 398; Duson v. Thompson, 32 La.Ann. 861). Ordinarily (since a voluntary and direct avowal by an illegal voter is seldom had), extrinsic evidence must be employed to determine who the illegal voters were and ascertain how they voted, and circumstantial evidence is competent to prove that fact (29 C.J.S. Verbo Elections §§ 282 and 283, p. 403; 18 Am.Jur. 380, Verbo Elections, Section 309; Hendrickson v. Coign, 304 Ky. 383, 200 S.W.2d 905; Wilkinson v. McGill, 192 Md. 387, 64 A.2d 266; White v. Slama, 89 Neb. 65, 130 N.W. 978; In re Contest of Election of Clerk of Common School Dist. No. 107, Fillmore County, 159 Minn. 438, 199 N.W. 173; Tunks v. Vincent, 106 Ky. 829, 51 S.W. 622; 20 C.J. 247, Verbo Elections, §§ 341 and 342); and "where the facts and circumstances from which the finding is made are clearly established, and the inference is the only one which can *763 fairly and reasonably be deduced therefrom, the court should not hesitate to act on circumstantial evidence and therefrom find the ultimate fact. * * * The party affiliations of the voter, and the relations between the voter and the candidates, or between him and others actively interested in advancing the cause of certain candidates, are circumstances properly to be considered." 9 R.C.L. 1150, Verbo Elections, Sec. 141; see, also, 24 Ann.Cases 1912C, annotation at pp. 522-524; Talbott v. Thompson, 350 Ill. 86, 182 N.E. 784; Choisser v. York, 211 Ill. 56, 71 N.E. 940; Rexroth v. Schein, 206 Ill. 80, 69 N.E. 240.
The law governing primary elections declares that (R.S. 18:340) the Parish Committee shall select from lists furnished by local candidates containing names of proposed commissioners for each precinct in the parish, five commissioners for each voting precinct, according to a plan outlined in detail; and the remaining persons whose names appear on the list shall be commissioned as official watchers for the precinct. The provision with regard to second primaries such as that with which we are here concerned (R.S. 18:357(3)) is that the same commissioners shall serve who served in the first primary, the watchers to be those who served in the first primary as representatives of candidates who remain as candidates in the second primary. The law governing the procedure for voting (R.S. 18:256, one of many sections of the Revised Statutes added by the provisions of Act 415 of 1952) is specific with reference to the conditions to be met before a person may vote, all requirements being mandatory; the voter gives his name and address to a commissioner; these are repeated then in a loud and distinct tone of voice, and repeated again on the outside by a watcher designated by the commissioners; if the name is found in the precinct register by the commissioner, he again repeats it; the voter affixes his signature in the space provided on the certificate of registration former signatures and his registration signature thereon being effectively concealed from him until he has signed; the commissioners then compare signatures, in the presence and view of bystanders, and if satisfied of the voter's identity and qualification, "a commissioner shall sign his name in the space reserved for the commissioner's certification opposite the name written by the voter and shall put the date of election in the proper space. * * * The voter shall then, but not until then, be allowed to vote, and his name shall be entered on the poll list by the commissioners." With the above system prevailing and carried out, it was clearly an impossibility for any person to enter the voting machine and vote without the knowledge and consent of the commissioners present and unless permitted to do so, because their participation and active assistance was necessary to (a) check the precinct register, (b) write the name of the voter in the poll list, and (c) clear the voting machine for the next vote. There is, moreover, the legal presumption that all votes recorded on the voting machine have been so recorded only with the knowledge of the commissioners, since the commissioners are presumed to do their duty. Landry v. Ozenne, 194 La. 853, 195 So. 14; State ex rel. Todd v. Mills, 191 La. 1, 184 So. 350.
The uncontroverted evidence adduced at the trial of the case shows that in the Third Precinct of the Second Ward at least 17 votes were illegally cast, including 2 forgeries,[9] and that they could not have been cast by anybody but the commissioners *764 or by someone with the assistance and connivance of the commissioners; that the illegally cast votes were sufficient to make a change in the result of the election and thus flout the will of the people. After hearing the arguments of counsel presented here, we were unanimous in concluding that those votes were, in contemplation of law, fraudulent, and sufficient to set aside the judgment of the lower court naming O'Hara the nominee; we were also unanimous in the thought that under the law as stated earlier in this opinion, if it is possible to determine for whom the said votes were cast, they should be deducted from the total of the person for whom they were counted; but our point of disagreement was whether it could be reasonably inferred, in view of the uncontroverted evidence that all the commissioners were O'Hara supporters or affiliated with the political faction supporting him, and the further fact that one of the commissioners wrote all the names appearing on the poll list, including names to account for the 17 fraudulent votes, that those votes would have been cast for O'Hara's opponentor, as an alternative, whether the second primary election should be declared void.
We wish particularly to state that O'Hara is not even suspected of having had knowledge of or participation in the acts which resulted in the fraud committed in the Third Precinct of the Second Ward. He is a respected member of the Bar, favorably known in the community, and no action taken in this case is connected with him personally or should reflect on his character in any way, shape or form.
Is it reasonable to suppose that the votes would have been cast for plaintiff in preference to O'Hara? Of the five commissioners who served in the precinct where the fraudulent votes were cast, two testified at the trial, having been called by the plaintiff; they are William C. Baumann and Adolph J. Zimmerman, both employed by the Clerk of the Civil District Court, Mr. Tom Buckley, who is also the leader of the Second Ward for the political faction supporting O'Hara, the Crescent City Democratic Association, or C.C.D.A. Those witnesses stated that all five commissioners wore O'Hara badges, and Zimmerman said it was he who wrote all the names on the poll list; but he was unable to account for the circumstance that the said list contained names of such a large number of voters who did not sign the precinct register other than to say that "A few times during the day I got behind with the poll list and I had to catch up" with the number shown on the voting machinethe discrepancy having come to light in periodic checks during the course of the day; "so I would say that some of the names on here [poll list] may not be the ones that voted." Yet the vote was lightonly 192 votes were recorded on the one machine in the Third Precinct of the Second Ward during the hours between 6 A.M. and 8 P.M.; and each voter had but two marks to make on his ballot since there were only four candidates in the runoff primary, two each for the nominations for criminal judge and district attorney. No explanation was attempted by defendants; they declined to offer any evidence and their sole defense on this phase was that the plaintiff failed to carry the burden of proof. Since the election officers themselves, according to the uncontradicted testimony, were the only persons in a position to cast the illegal ballots or to permit them to be cast, and since they were supporting O'Hara, it is inconceivable that the votes would have been cast for a candidate other than the one of their choice. We have therefore concluded that the 17 fraudulent votes were cast for O'Hara and should be deducted from the total vote credited to him, thus leaving plaintiff with a clear majority of the legal votes cast and entitling him to the nomination for the Democratic Party for the office of District Attorney of Orleans Parish. To reach any other conclusion would be to lend help to those who are perpetrating fraud, thereby defeating the principle that the sovereign in this land is the people, and the ballot the expression of the sovereign will.
*765 The decision we have reached makes it unnecessary to discuss at length plaintiff's contention that he should have been permitted to amend his original petition, since the amendments merely amplified, emphasized and substantiated his original allegations of fraud and irregularities in specific locations; and in one instance, that of the First Precinct of the Seventh Ward, though not among those mentioned in the original petition, the amendment should have been allowed under the original allegations of "wholesale irregularities and fraud" and "a system of fraud" and he should have been permitted to show that 27 named persons did not vote and did not sign the precinct register, yet the names of all 27 appeared on the poll list as having voted.[10] A perusal of the decision of this Court relied on by the district judge as a basis for his ruling in rejecting the amendments to the petition and excluding the evidence, Bradley v. Neill, 174 La. 702, 141 So. 382, 384, will show that it is not fully applicable, because there it was said: "Plaintiff's proposed amendment was not an enlargement or amplification of his original petition, but was an entirely new ground of contest which, we think, plaintiff was too late in urging."[11] Suffice to say that the offered amendments did not, in our view, present a new ground of contest, but merely particularized and amplified the original allegations, and should have been permitted; and the evidence was admissible for the purpose of showing a system and indicating the extent of the fraud practiced in the election.
We also find it unnecessary to discuss further the failure of commissioners to sign the precinct register after the voter has placed his signature thereon, and to enter the date of the election in the proper space, other than to say that such gross irregularities cannot be condoned. A failure to correct those practices would permit a most flagrant manipulation of ballots and would enable a set of officers to substitute their own will for the will of the people. It occurs to us that as a practical matter the method now used in selecting commissioners for primary elections and the present system of having those commissioners serve again if a second primary is held, presents a tempting opportunitynot readily subject to challengefor the development of illegal and fraudulent practices of the most insidious type. Without intending to cast aspersions on any particular group, and speaking generally, it is highly probable that, since the dominant political faction always presents a full slate for the first primary where the number of offices to be filled is usually large, and since the number of contestants in the second primary is apt to be quite small, the election commissioners appointed for the first primary who serve again in the second are likely to be supporters of the dominant political faction and of the candidate endorsed by that faction (the record in this case reveals that to have been the fact in the election with which we are here concerned). Obviously, if all five commissioners have the same political affiliation, they will dominate the poll, *766 with the result that the candidate without endorsement of that faction is, from a political viewpoint, unrepresented. The matter is one which merits the prompt attention of our lawmakers, with a view to devising a system of selection of commissioners to insure that everyone is represented at the polls in all elections.
For convenience, we repeat here the decree which was handed down by us in this matter on March 20, 1958:
The judgment of the lower court is annulled and set aside, and it is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Richard A. Dowling, and against the defendants, Malcolm V. O'Hara and the Orleans Parish Democratic Committee, decreeing that the plaintiff, Richard A. Dowling, has received a majority of the votes cast in the Second Primary Election held in New Orleans on February 25, 1958, and accordingly is the nominee of the Democratic party for the office of District Attorney for the Parish of Orleans. Defendants to pay all costs.
HAMITER, HAWTHORNE and McCALEB, JJ., concur in part and dissent in part.
McCALEB, Justice (concurring in part and dissenting in part).
I subscribe to the observations made in the prevailing opinion respecting absentee voting and also think it clear that contestant has established the casting of 17 illegal votes in the Third Precinct of the Second Ward. But the majority are mistaken when they state "* * * we were unanimous in concluding that those votes were, in contemplation of law, fraudulent, * * *" as I have never agreed that they were necessarily fraudulent.
My view is that the 17 votes are illegal; they may have been fraudulent but the evidence does not reveal who cast them or the circumstances under which they were cast and, consequently, I am unable to say with any degree of certainty that they must be fraudulent. But, as the 17 votes were unquestionably illegal votes, the election should have been set aside and another primary ordered because it is not certain, since O'Hara's majority was only 9 votes, whether the voting machines express the will of the Democratic electors. In this connection, I believe it apt to answer the statement made by one of defense counsel at the special hearing, called for the purpose of determining whether another primary should be ordered or whether the contestant should be declared the nominee, that the unanimous view of the Court respecting the illegality of the election herein is contrary to its prior pronouncements.
There are numerous election contest cases to be found in the jurisprudence, the last expression of this Court on the subject being Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292, which, incidentally, is the first case involving an election at which voting machines were used. In that matter, it was reiterated that the Primary Law (R.S. 18:364) accorded to an unsuccessful candidate the right to maintain an election contest only where he claimed that, but for fraud or other irregularities specifically alleged, he would have received a majority of the legal votes cast. But it was further declared that judicial recognition had been given to an alternative not specified by the statute, that "* * * in the event the court finds that the frauds and irregularities alleged and proven are of such a grave nature as to deprive the voters of the free expression of their will, it will annul the Primary and order the holding of another election".
The petition in the Lewis case was found insufficient to support a cause of action, even though it was charged therein that some 228 non-resident and unqualified persons were permitted to vote at a certain election precinct. This ruling was predicated on plaintiff's failure to exercise the remedy provided by the Primary Law of purging the registration rolls and it was *767 further observed that he did not allege that any one of his watchers protested to the commissioners the asserted infractions of the law.
The contrary conclusion in the case at bar, as applied to the 17 illegal votes cast in the Third Precinct of the Second Ward, rests on a different basis. Unlike the City of Eunice, the City of New Orleans is governed by the permanent registration law (R.S. 18:231-261) which is mandatory in all parishes containing a municipal corporation of more than 100,000 population. In addition to providing for a permanent registration of voters, the Legislature, in keeping with its policy of insuring honest elections, has prescribed for the use of precinct registers at the polls, R.S. 18:238 declaring, among other things, that:
"No person who applies to vote shall be permitted to do so until he has signed his certificate of registration in the precinct register and until a voting commissioner has signed and dated his certification on the voter's certificate of registration, * * *".
Thus, in this case, where the tabulation of the voting machine from the Third Precinct of the Second Ward reveals a total of 17 votes more than the number of persons' signatures contained on the precinct register, it is fair to deduce that there were 17 illegal votes cast in the precinct.[1] Under such conditions, it is neither contemplated nor essential that a protest be made by a watcher or representative of the contestant as the purpose of the law is to eliminate the possibility of illegal or fraudulent voting. Accordingly, in instances where the proven illegal votes may well affect the accuracy of the proclaimed result, it becomes the obligation of the Court to set aside the election and order another one. This is what I believe should be done in this case.
The majority conclude, however, that, since the five commissioners in the Third Precinct of the Second Ward wore O'Hara badges and since one of these commissioners in charge of the poll list indiscriminately added thereon during the voting hours at least 17 names from the registration roll of persons who did not vote in the election, it is to be presumed that the 17 illegal votes were cast for O'Hara either by one or more of the commissioners or through their connivance. This holding is said to rest on the principle that circumstantial evidence is admissible to prove for whom illegal votes were cast in an election and, where the facts from which the finding is made are clearly established and the inference "is the only one" to be fairly deduced, the court should not hesitate to act on the circumstantial evidence and find therefrom the ultimate fact. See 18 Am.Jur. "Elections", Section 309.
The rule relied on is well recognized but I think it has been misapplied as the inference drawn by the majority is not founded upon an established fact but, rather, upon another inference drawn from a proven fact.
In the leading case of United States v. Ross, 1875, 92 U.S. 281, 23 L.Ed. 707, it is said that "Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved, and not themselves presumed". Although this substantially expresses the practically unanimous view of the courts of this country, it has been subjected to criticism by some of the lawbook writers, including Mr. Wigmore. See Wigmore on Evidence, 3rd Ed., Vol. 1, Section 41. However, as pointed out by Judge Lockwood in New York Life Ins. Co. *768 v. McNeely, 1938, 52 Ariz. 181, 79 P.2d 948, 954, the divergence between the textwriters and the courts relates more to the form of the statement of the rule than in its application. He correctly observes that "* * * when an inference of the probability of the ultimate fact must be drawn from facts whose existence is itself based only on an inference or a chain of inferences, it will be found that the courts have, with very few exceptions, held in substance, although usually not in terms, that all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases, in order to support a final inference of the probability of the ultimate fact in issue".
Accordingly, in practical application, the rule in civil cases as to circumstantial evidence, when the inference drawn for the ultimate fact is founded only on another inference, is no different from that obtaining in criminal cases, which is, as stated in Article 438 of our Code of Criminal Procedure (R.S. 15:438), that "* * * assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence".
Employment of this rule in the case at bar does not, in my opinion, justify the conclusion that the only reasonable inference to be drawn from the evidence is that the commissioners either voted the 17 illegal votes for O'Hara or that those votes were cast for him through their connivance. Indeed, the only fact established by direct evidence is that 17 more votes were cast in the machine than shown by the signatures on the precinct register kept at the poll and there is no evidence, either direct or circumstantial, tending to establish by whom these votes were cast.
Two hypotheses, equally reasonable, flow from the proof(1) that the commissioner in charge of the precinct register, either knowingly or negligently, permitted 17 persons to vote without signing the register, or (2) that this commissioner, or some or all of the commissioners acting in concert, fraudulently cast 17 votes in the machines. In the case of the former, the votes would not necessarily be fraudulent votes for, if the commissioner, either negligently or knowingly, permitted 17 qualified voters of the precinct to cast their votes in the machine without signing the precinct register, the votes might be illegal, because the formality of the law was not complied with, but not fraudulent inasmuch as the voter was qualified to vote in the precinct. Surely, no inference is justifiable under this hypothesis that the votes were cast for O'Hara.
If, on the other hand, the commissioner, either negligently or knowingly, permitted unqualified persons to vote in the precinct, the votes would be fraudulent but here again it would not be reasonable to assume that they were cast for O'Hara in the absence of proof that the persons casting them were acting in concert with, and at the direction of, the commissioners.
Of course, if the commissioners, acting either in concert or individually, cast the 17 illegal votes in the machines, then it might be reasonable to infer that they cast their votes for O'Hara, whom they represented at the polls.[2] But, before such an inference may be drawn, the circumstantial evidence must be such as to make the conclusion inescapable that the commissioners cast these votes or that they were cast through their connivance.
This is the point at which the reasonable hypothesis rule respecting circumstantial evidence comes into play, forunless the circumstances are such as to exclude every reasonable hypothesis other than that the commissioners fraudulently cast these votes *769 or conspired to have them cast, the further inference that they were cast for O'Hara cannot logically be drawn. The fact that one of the commissioners, who kept the poll list, wrote down indiscriminately during the voting hours the names of 17 persons who were registered in the precinct in order to make the poll list tally with the votes cast on the machines is, I must concede, a suspicious circumstance. Yet it is not enough, in my opinion, to exclude all other hypotheses or to give substantial certainty to the conclusion reached by the majority that contestant is the nominee because the 17 illegal votes must have been cast for O'Hara.
I therefore respectfully dissent from the ruling that the contestant has proven that he received a majority of the legal votes cast in the election and is, therefore, entitled to the Democratic nomination.
HAWTHORNE, Justice (concurring in part and dissenting in part).
The judgment of the lower court dismissed plaintiff Dowling's suit, the effect of which was to leave O'Hara as the Democratic nominee for the office of district attorney of Orleans Parish. I am in complete and full accord with the decree of the Supreme Court insofar as it annuls and sets aside this judgment. I am of this view because appellant Dowling has established to my satisfaction that in the conducting of the election gross irregularities occurred which, under the facts of this case, deprived the electors of the opportunity to freely express their will.
The facts of this case disclose that at the primary election over 91,000 votes were cast. By the final tabulation of the votes O'Hara received a majority of only nine votes, and was accordingly declared the nominee. It is proven beyond any question, however, that in the Third Precinct of the Second Ward 17 illegal votes were cast, a greater number than the total of O'Hara's majority. Accordingly these 17 votes must be disregarded and not included in the final tabulation of all votes cast for both candidates. That the total of these votes should be deducted from the total of all votes cast is clear, but the perplexing question is: From which candidate's total votes should they be deducted? This question must be answered before the court can determine which candidate received a majority and is therefore entitled to the nomination.
Appellant Dowling contends that he has established and proven that the illegal votes were cast for O'Hara and must be deducted or substracted from O'Hara's total vote, after which he, Dowling, would have a majority and would be entitled to the nomination. To prove that these votes were cast for O'Hara he relies on circumstantial evidence.
That such a fact can be established by circumstantial evidence is recognized by the opinions of the courts of our sister states, but circumstantial evidence to prove this fact must be of such a nature as to exclude with a fair amount of certainty every other reasonable hypothesis. The fact that the commissioners at the precinct here involved were wearing O'Hara badges and were affiliated with the political faction supporting him was not, in my opinion, a sufficient circumstance to prove that the illegal votes were cast for O'Hara and to exclude with a fair amount of certainty every other reasonable hypothesis.
For this reason I think this court should order the second primary election annulled and set aside and another primary election held so that the will of the majority of the people can be determined. See Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292.
HAMITER, Justice (concurring in part and dissenting in part).
I am satisfied that fraud, sufficient to nullify the result of the election as promulgated by the Democratic Committee, was perpetrated in the casting of the contested seventeen votes in Precinct 3 of *770 Ward 2. To me it is inconceivable that these votes could have been cast without the knowledge and assistance of at least three of the attending commissioners (this number is required at all times for the proper operation of the polling place).
But merely because the commissioners wore badges bearing the name of Mr. O'Hara, and they were considered to be members of his political faction, it does not necessarily follow that such candidate received the illegal votes. The persons guilty of the wrongful manipulation of the voting machine, thereby depriving the voters of the free expression of their will, also would not have hesitated to commitand might well have performeda Judas Iscariot act: they, for suitable remuneration, turning against the person whom they apparently favored in the first instance.
Therefore, I am of the opinion that, rather than declaring Mr. Dowling to be the Democratic nominee, there should be judgment ordering the calling and holding of another second primary election.
NOTES
[1] Reference is made to R.S. 18:259, providing, in part: "* * * The commissioners having observed and found the ballot to be regular as far as can be observed from its official endorsements, a commissioner shall deposit it in the proper ballot box. * * *"
[2] Those totals, as tabulated by the Orleans Parish Democratic Committee, were 45,696 for O'Hara and 45,683 for plaintiff, a difference of 13 votes in favor of O'Hara; and according to the totals transcribed from the voting machines by the Parish Custodian of voting machines (included in which were the absentee votes), O'Hara received 45,692 votes and plaintiff, 45,683, a difference of 9 votes in favor of O'Hara. R.S. 18:1193 provides: "* * * these totals so transcribed [from the voting machines] by the parish custodian shall become legal evidence of the number of votes cast for each candidate in said election, and accepted as such in any contest suit which may arise."
[3] The portion of the article quoted by plaintiff is: "* * * The Legislature shall provide some plan by which the voters may prepare their ballots in secrecy at the polls * * *." (Emphasis supplied.)
[4] The original petition, filed on March 5, 1958, contained allegations that fraud and irregularities in specific numbers had taken place in specified precincts, but contained no names; the names of individuals to substantiate the numbers were offered by amendments to the various paragraphs by supplemental petition filed on March 7; but on defendants' exceptions of no cause or right of action filed at the opening of the trial on Monday, March 10, the amendment was not allowed, and the trial judge later ruled that no evidence could be adduced to support it.
[5] By second supplemental petition (filed on the fifth day after suit was filed, that being the day the case came up for trial on the merits) the same course of action is alleged to have been followed in Ward 5, Precinct 2, in the case of 115 named persons, but an exception of no cause or right of action, filed by O'Hara, was maintained, and that supplemental petition dismissed.
[6] This is explained by plaintiff as follows: "Your petitioner * * * shows that under the provisions of the primary election law and the regulations of the Orleans Parish Democratic Committee, your petitioner was allowed to submit the name of one person for each Precinct of each Ward to serve as a commissioner, and in the event his name was not drawn to serve as an official watcher; that there are 328 voting Precincts in the Parish of Orleans and that your petitioner was therefore allotted one commissioner or one watcher to each Precinct; that each Precinct requires the services of five (5) election commissioners, and that, therefore, out of a total of 1,650 commissioners who served in the Second Primary your petitioner was represented by a negligible number; that it was impossible for one commissioner or one watcher to continuously stay at the polling place from 6 A.M. until 8 P.M.; that therefore it was humanly impossible to watch, detect and formally protest all of the irregularities and frauds which were committed in various Precincts of the various Wards in the City * * *."
[7] "Voting machines shall be used in all parishes containing a municipal corporation of more than one hundred and fifty thousand, as shown by the last published United States census. * * * Nothing in this Chapter prohibits absentee voting as provided in this Title." R.S. 18:1165.
[8] The law then in effect, Act 35 of 1916, Section 14, provided that "each ballot at the bottom and after the pledge shall contain a perforated slip with its number displayed in large numerals, which said slip shall be numbered from one to one thousand * * The ballot with a slip numbered * * shall be handed to the voter by the commissioners of election for the voter to take with him to the polling booth, who, after marking his ballot, shall * * allow the commissioner of election to detach or remove the slip without defacing or tearing the ballot and without in any way exposing to view the face of the ballot. * * * The voter shall always have the right to retain possession of his ballot" until deposited in the ballot box; the commissioner, after detaching the slip, entered the number opposite the voter's name to correspond with the number on the official list of those voting, and discarded the slip. (Emphasis supplied.) Similarity of the above provisions to law presently in effect is noted in R.S. 18:349.
[9] Ten persons whose names appear on the poll list as having voted testified that they did not vote in the second primary election and did not sign the Register; in the case of two of these, whose names were signed on the Register, forgery was claimed. The names of 10 other persons were entered on the poll list as having voted, although their signatures did not appear on the precinct register. Upon repeated objection by counsel for O'Hara, the trial judge stated he would limit his consideration of the evidence to a total of 17 illegal votes, since that number was alleged as having been cast in the Third Precinct of the Second Ward.
[10] The testimony of the witness Shirley Keaton, having been objected to by counsel for defendants, was excluded by the court; counsel for plaintiff thereupon stated that he had intended to prove by the witness that she did not vote in the Second Primary, and he tendered 26 additional named witnesses who would, he said, testify to the same effect.
[11] The rationale of the rule was stated by the Court in these words: "* * * The intention of the lawmaker apparently was that the contestant should set forth at one time and at the outset all the facts on which he bases his contest. And in any event, a contestant ought not be permitted to amend his petition setting up new grounds of action after the two days allowed by the statute for filing the suit have elapsed, because defendant would then be entitled to service and additional delay for answering, and could, in turn, set up new defenses, thereby defeating the purpose of the law and destroying the summary character of the proceeding." 174 La. at page 711, 141 So. at page 384.
[1] I am aware that this deduction of illegality would be questionable, if it were shown that the voters who actually cast the votes without signing the precinct register, were otherwise qualified electors of the precinct. In such instance, it might be forcibly argued that the qualified voter may not be deprived of suffrage by the dereliction of the precinct commissioner in failing to comply, either knowingly or negligently, with the provisions of R.S. 18:238.
[2] Even under such conditions, the inference drawn would not necessity reflect certainty and, hence, the Court should hesitate to resolve the issue for the electors. Albeit, experience in human affairs prompts cautionfor it is not always realistic to believe that the mere wearing of a badge of support exhibits the truth. The badge may well be employed to cloak it.