REDMANN, Judge
(dissenting).
This dissent is not based on any supposition that election irregularities are attributable to the contestee, Harry Connick, or to persons aligned with him. It merely expresses the view that the contestant, Jim Garrison, should have the opportunity to prove his allegations which leave the election outcome questionable.
Unfortunately, the appearance is sometimes falsely created that the courts and *687 the legislature are striving to encourage rather than suppress election irregularities. The legislature attempts to limit courts not only by one- or two-day action deadlines, but also by providing (as the courts interpret R.S. 18:362) that election contests become moot unless finished by absentee ballot printing time. See Downs v. Pharis, 1960, 240 La. 580, 124 So.2d 553.
The pressure of these deadlines effectively prevent the preparation and trial of any election contest with a large number of irregularities. If the contestant must discover the names of, say, 2,369 voters and list each, all in the space of 48 hours, he will probably not have time. And, if it is a fraud case in which he must present the testimony of each of those 2,369 voters by 30 days before the next election, perhaps six weeks off, he will probably not have time.
Paradoxically, then, the laws that are presumably to protect against fraud, illegality and irregularity are only effective against small frauds, etc. If the fraud or the like is big enough, the law guarantees that it will go undetected and therefore succeed.
This problem calls especially to the Legislature for solution, but meanwhile the courts could at least avoid compounding it.
The only question at this stage of this election contest is whether contestant Jim Garrison should be allowed a trial.
Louisiana’s Constitution, art. 8 § 12, declares “The Legislature shall provide by law for the trial and determination of contested elections of all public officers, * * * which trials shall be by the courts of law, and at the domicile of the party defendant.” Our Supreme Court has ruled that this provision applies to primary elections as well as general elections. McCall v. Regan, 1948, 214 La. 254, 36 So.2d 830.
The only election contests in which trial has been refused (when the court did have jurisdiction and the contest was timely[1]) were cases where the number of absolutely illegal votes specifically alleged was not as large as the number by which the contestant lost the election.[2] A court may constitutionally refuse actual trial in a case where, for example, the loser lost by 136 votes but only complained that 105 votes were illegally cast. The court in such a case may in effect concede that trial could prove 105 illegal votes, but the winner would still win by 31 (instead of the original 136) votes.
Those were the numbers involved in Smith v. Washington Parish Demo. Comm., 1960, 239 La. 827, 120 So.2d 257 (in which the case did, in fact, go to trial). The Supreme Court there reasoned that, as to 147 votes, failures of the commissioners to date or sign after the voter’s signature were mere “oversights” in their “ministerial duties” (120 So.2d at 260) and refused to declare those 147 votes illegal. There accordingly remained only 105 other votes in contest. The Court explained, at 120 So.2d 261: “Conceding, but not holding, that all of these 105 votes are illegal there are not enough votes to change the result of the election.”
Here Garrison, the apparent loser by 2,221 votes, has set forth by ward and precinct a total of 2,369 votes cast in the names of persons who did not sign the precinct register. If it is conceded that 2,369 illegal votes were included in the tally, that number is “enough votes to change the result of the election.”
The allegations as to those 2,369 illegal votes are not sufficient (if proven) to *688 show that Garrison won, but they are sufficient to show that one cannot be certain who did win. Conceivably all 2,369 illegal votes went to Garrison, in which case he should have lost by 4,590; but conceivably all went to Connick, in which case Garrison should have won with 148 more legal votes than Connick. The point is that the results of the legal votes cast is unclear; the expression of the will of the people cannot be determined with certainty.
If our election laws are “to secure fairness in party primary elections”, as our Constitution expressly requires in art. 8 § 4, we cannot tolerate elections with more votes than voters, when the extra votes number enough to decide the winner.

Specificity

In Garrison’s original petition, as amplified by his first supplemental and amending petition (to which no objection was taken), he alleged (in several typed pages) for approximately 150 specified precincts the specific number of voter signatures and the specific number of votes shown by the voting machines in each precinct, then the specific number of extra votes in each precinct, and finally a total of 2,406 extra votes (reduced to 2,369 by a second supplemental and amending petition which amended some earlier figures).
The law, R.S. 18:364, subd. B, is that the “petition shall set forth specifically in detail the grounds on which the contest is based and the irregularities or frauds of which complaint is made.”
' This specificity requirement is met by allegations such as “In Ward 11 Precinct 14 the machines and poll lists registered 369 votes, the precinct register contained 353 signatures, for a difference of 16 illegal or fraudulent votes.” The defendant is made 100% aware of exactly what he faces at trial: plaintiff must produce poll lists and precinct registers to show the votes were illegal.[3]
Our Supreme Court in Landry v. Ozenne, 1940, 194 La. 853, 195 So. 14, 22, reaffirmed its explanation of the specificity requirement stated in State v. Mills, 1938, 191 La. 1, 184 So. 350, 354: “[Ojur decisions are uniform to the effect that general charges of fraud, mistake, intimidation, irregularities, etc., will be disregarded. If a contestant has a solid legal basis for complaint, he can readily state the specific facts on which he bases his complaint. A petition in which the complaints are couched in general terms can be regarded in no other light than as a mere fishing expedition which courts do not countenance.” (Emphasis added.)
In my opinion Garrison had a “solid legal basis for complaint” and did state “the specific facts on which he bases his complaint.” His petition is unlike that in Landry, of which the court said, 195 So. at 18, it declared “a certain number of ballots, or more, were spoiled. Needless to say, such an averment is a conclusion of the pleader. * * * The sum and substance of the language he has used is nothing but generalities. He conveys to the Court the averment that, if a certain ballot is not spoiled for one reason, it may or may not be spoiled for some other reason, and this, ad infinitum.”
Garrison does not couch his first complaint (that of the 2,369 extra votes) in generalities. He specifies precinct, then machine and poll list total, then precinct register total in every instance of discrepancy.

Illegality

One may characterize some votes as merely irregular but legal (e. g., commissioner fails to sign, as in Smith, supra). At the other extreme is the fraudulent vote (e. g., commissioners vote persons who do *689 not appear, as in Dowling, infra). But there is a third category of votes which are illegal and void though perhaps not fraudulent. The 2,369 votes which Garrison “specifically in detail” alleged were cast for persons who did not sign the precinct register [4] fall into this middle category (though some may also be fraudulent).
In Dowling v. Orleans Parish Demo. Comm., 1958, 235 La. 62, 102 So.2d 755, the majority and each of the three part concurred part dissenters unanimously and expressly agreed that the 17 votes in question were illegal (the majority said the court was unanimous they were “fraudulent”) and could not be counted.[5] Yet of those 17 votes only ten were by voters who testified they did not vote, so that seven had to be from the category of persons as to whom there was no other showing than that their names “were entered on the poll list as having voted, although their signatures did not appear on the precinct register.” 102 So.2d at 763, n. 9. See also Justice McGaleb’s partial dissent, 102 So.2d at 767, n. 1, where he suggests that if defendant had shown that the unsigning but otherwise qualified voters had actually cast the votes, “this deduction of illegality would be questionable * *
This unanimous declaration of illegality by the Supreme Court is unchanged by Smith v. Washington Parish Demo. Comm., supra. Smith’s only reference to Dowling is to Dowling’s dictum about “the failure of commissioners to sign the precinct register after the voter has placed his signature thereon * * See 120 So. 2d at 261. (Emphasis added.)

Remedy

As Dowling indicated (and the three partial dissenters there would have ruled), “as an alternative, it has been recognized that if the Court finds the proven frauds and irregularities are of such a serious nature as to deprive the voters of the free expression of their will, it will decree the nullity of the entire election — even though the contestant might not be able to prove that he would have been nominated but for such fraud and irregularities (Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292; Vidrine v. Eldred, 153 La. 779, 96 So. 566).” 102 So.2d 762.
See also Hart v. Picou, 1920, 147 La. 1017, 86 So. 479, where an election was nullified because of emergency use of locally-printed ballots which did not safeguard by perforated numeration against “endless chain” vote fraud. Surely fraud is similarly invited (especially for future elections) if the law would tolerate votes without the voters’ signatures: the commissioners could vote missing voters and even require the doubtfully-faithful partisans to stay home to be sure their votes were voted for the faction’s choice.
The proper remedy, if Garrison upon trial can prove the 2,369 illegal votes he specifically alleged, is to annul the election.

Conclusion

Garrison’s petition specifically alleges grounds for annulling the election. He may very well not be able to prove those grounds and therefore lose after trial. But Louisiana’s constitutional provisions, for both fairness in primary elections and for “trial” of election contests, require that he be allowed to go to trial.

. Thus there was no trial in McCall, supra, but no jurisdiction; in Downs v. Pharis, supra, but no time remained to print ballots. Another category is exemplified by Treadaway v. Plaquemines Parish, D.Comm., La.App.1940, 193 So. 609, a two-vote margin case where six votes of registered voters were challenged, by a claim the voters were aliens; the court held registration cannot be attacked collaterally and therefore refused trial.

. See, e. g., Lafargue v. Galloway, 1936, 184 La. 707, 167 So. 197.

. He might further, but in my view is not obliged to, produce the voters in person to show the votes were fraudulent, i. e. not even cast by the voter.

. See R.S. 18 :238.

. It is possible to argue that the critical margin in Dowling was only 9 votes, because that was the parish custodian’s margin; R.S. 18:1193. See 102 So.2d at 757, n. 2. However, the court’s ratio decidendi was expressly not limited to the ten proven fraudulent votes.