GULOTTA, Judge.
In this Congressional second primary election contest, James Moreau claims 1) that elimination of the fraudulent and illegal votes cast for his opponent, Richard Tonry, would result in Moreau’s receiving a majority of the legal votes cast, thereby entitling him to be certified as the Democratic nominee; or, alternatively, 2) that fraud and illegality were so widespread and systematic that the results of the election are unreliable and a new election should be ordered.
It is Moreau’s contention that fraudulent votes, well in excess of Tonry’s 184-vote *792 majority tabulated by the Clerks of Court,[1] were cast in voting precincts controlled by Tonry commissioners and supporters and that the result of the election would be changed if those fraudulent votes were eliminated.
According to Moreau, in 15 voting precincts in St. Bernard Parish, 616 more votes were cast on the machines than the total number of persons listed on the precinct registers as having voted; and, the names of persons who did not appear at the polling places to vote were entered on poll lists, and votes in a corresponding number were voted on machines in those precincts.
Moreau claims that in the suspect precincts, and particularly three of those precincts,[2] the names of persons who had not appeared at the precinct to vote were placed on the poll lists, were voted on the machines, and no signatures were entered on the precinct registers; further, that persons’ names were entered on the poll lists and a corresponding number of votes were cast on the machines when, in fact, the persons named on the poll lists were not registered in that precinct; also, that persons’ names were entered twice on the poll lists and votes were cast in corresponding numbers. He claims that 146 forgeries were made in the precinct registers, and a corresponding number of votes were cast on the machines. These forgeries, Moreau contends, are in addition to the 616 fraudulent votes cast. He claims, further, that the names of three deceased persons were forged and votes cast for those deceased persons. According to Moreau, when these fraudulent votes are eliminated, he, as recipient of the majority of the legal votes cast, is entitled to be declared the Democratic nominee. Alternatively, he contends that if the proven frauds and irregularities are of such a “serious nature” as to deprive the voters of the free expression of their will, the election should be set aside and a new election ordered.
In dismissing Moreau’s suit, the trial judge concluded that 74 illegal or fraudulent votes had been cast in favor of Tonry; and, after eliminating and deducting those votes from Tonry’s total, he declared Tonry the Democratic nominee. In oral reasons for judgment, the trial judge concluded that 51 forgeries were proved from the testimony of Gilbert J. Fortier, Jr., a handwriting expert. He further concluded that in Ward 3, Precinct 6 of St. Bernard Parish, all five commissioners were Tonry supporters who had invoked the Fifth Amendment of the United States Constitution and refused to testify concerning the practices in that precinct during the election conducted on October 2, 1976. Based on a showing that 23 votes were cast on the voting machines in excess of the number of signatures in that precinct register, the judge isolated those excess votes and purged them from the Tonry total in that precinct. Any additional claims of irregularity, illegality or fraudulent voting were rejected by the trial judge. He further rejected Moreau’s alternative plea to set aside the election.
While we are in agreement with the conclusion reached by the trial judge that a number of illegal votes were cast, the record discloses a different total of votes which can be identified. Our consideration of the testimony leads us to conclude that in one precinct (Ward 3, Precinct 6) 41 forged votes were cast according to the handwriting expert. Of those 41, three were forgeries of deceased persons who were voted in St. Bernard Parish.[3] In addition, one voter who appeared at the polls testified that a Tonry commissioner entered the voting machine with him, and the commissioner cast a vote for Tonry when the voter did not desire to do so. Further, in another precinct, one witness testified that he cast a vote and signed the register on *793 behalf of his wife who did not appear at the precinct. These forged and thus illegal votes total 43.
We reject Moreau’s contention that because of irregularities in the 15 suspect precincts where a greater amount of votes were cast on the voting machines and names were placed on the poll lists in excess of the signatures on the precinct registers, those votes totalling 616 should be eliminated and deducted from the Tonry vote. It is clear that a tabulation of Michael M. Chauppette, the internal auditor for Plaquemines Parish, showed 616 more votes cast on the voting machines than signatures on the precinct registers in the 15 suspect precincts.[4] According to Chauppette, examination of the names appearing on the poll lists in the particular precincts were checked against the precinct registers in those precincts, and where no corresponding signature appeared on the precinct register or no registration card was contained for that person in the precinct register, those names were totalled. Also, where a person’s name was listed twice on the poll list, these instances were noted.
Tonry contends that the authenticity of the discrepancies as they apparently appear on the tally sheets can be proved only by a comparison of the signatures on the poll lists with the precinct registers in each precinct, and that it is plaintiff’s burden to correlate the claimed fraudulent entries on the poll lists with the precinct registers showing that no corresponding signatures were entered on the precinct registers or that persons were not registered, notwithstanding that the precinct registers are available for inspection by the court. He further contends that it is not the court’s responsibility to ferret out this connecting evidence and to supply the proof to establish authenticity of plaintiff’s claim. We reject this argument.
In Dowling v. Orleans Parish Democratic Committee and O’Hara, 235 La. 62, 102 So.2d 755 (1958), the court stated that a contestant (seeking to be declared the nominee) must show that but for fraud and irregularity, he would have received a majority of the legal votes cast; or a contestant (seeking to set aside an election) must show that the illegalities and fraud were “of such a serious nature as to deprive the voters of the free expression of their will” requiring a nullity of the election. See also Lewis v. Democratic Executive Committee of Eunice, 232 La. 732, 95 So.2d 292 (1957).
It is clear that in certain precincts in St. Bernard Parish illegal votes were cast. These fraudulent practices cannot be condoned under any circumstances and must be ferreted out if we are to insure that the free and honest expression of the will of the electorate is reflected in the democratic process.
In three precincts alone, 315 more votes were cast on the machines than signatures entered on the precinct registers. However, these illegal votes cannot be identified and purged from the total vote received by Tonry since sufficient proof did not establish that all of the commissioners in those precincts were Tonry supporters or Tonry commissioners. Under the circumstances, no inference can be made that these illegal votes were cast for Tonry. See Dowling, supra. We cannot deduct the illegal votes from the Tonry total. We reject, therefore, Moreau’s claim that he is entitled to be declared the Democratic nominee.
We are quick to point out that no claim is made nor is it indicated that Tonry was a party to, participated in or condoned any of the proven illegal acts. It is not our intention to imply that our finding of illegal votes being cast reflects adversely on the character or reputation of either one of the two candidates.
Having so concluded, we now turn to a consideration of Moreau’s alternative plea that a new election should be called because of allegations of widespread and systematic fraud. The Louisiana Supreme Court, in Lewis, supra, indicated that where fraud or *794 illegality existed to such an extent as to deprive the voters of the free expression of their will, the election will be set aside. The court stated:
“* * * [If] the alleged fraud and irregularities were so gross as to make it evident that the electors did not have an opportunity to freely express their will, plaintiff would state a cause of action for annulment of the entire election even though he might not be able to prove that he would have been nominated but for such frauds and irregularities. * * * ”
The primary thrust of contestant’s alternative claim centers primarily around four precincts in Wards 3 and 4 of St. Bernard Parish. As hereinbefore pointed out, the record clearly establishes in Ward 3, Precinct 6, that 42 fraudulent votes were cast. The Chauppette audit graphically points out that in Ward 4, Precinct 1, 114 more votes were cast on the voting machines and were entered in the poll lists than signatures on the precinct register. In that precinct, the machines registered (including absentee votes) a total vote of 1,163. Approximately 10% of the votes registered in that precinct were cast without signatures appearing on the precinct register. Likewise, in Ward 4, Precinct 2, 178 more votes were cast on the voting machines and were entered in the poll lists than signatures on the precinct register. In that precinct, the machines registered a total vote of 1,002. Approximately 18% of the votes registered in that precinct were cast without signatures appearing on the precinct register.
The discrepancies revealed by Chaup-pette’s audit include numbers of votes cast in excess of signatures on the precinct registers and votes cast in the names of persons for whom there were no registration cards in the precinct register, and, in some instances, duplicate names on the poll lists for which corresponding votes were cast.
While we are aware of (and take judicial notice of) the fact that voting machine totals and registration book totals are not always equal, common sense compels the conclusion that the discrepancies in the instant case cannot be categorized as coincidental or as “honest error”. We conclude that it is not reasonable for such discrepancies to exist — particularly in light of the proven instances of fraud, illegality and irregularity hereinabove discussed in some detail.
Although these illegal votes cannot be attributable to one candidate or the other, nevertheless, the extent of the discrepancies in the three suspect precincts totalling 315 votes, when considered in light of the proven incidents of fraud and forgery, cannot be included in the vote total. The number of illegal votes exceeds the 184-vote majority of Tonry.
This conclusion is further augmented by applying the same reasoning to the evidence adduced in behalf of Tonry by his able counsel to the effect that the same type of discrepancies existed in the 28th precinct of Ward 8 of Orleans Parish, where 559 votes were cast and the number of votes exceeded the number of signatories to the precinct register by 116 — a percentage of approximately 20%.
Illegalities such as occurred in Ward 3, Precinct 6 and in Ward 4, Precincts 1 and 2, where votes were cast in the names of persons who in some cases were not even registered, or whose names were not signed to the precinct register, or where duplications on poll lists occurred, are of such serious nature that these practices will not be condoned or tolerated under any circumstances. We, therefore, conclude that the practices hereinabove described were just as effective in preventing the voters from expressing their will as if they had been restrained from such expression, in view of our finding that the total of the votes cast is inaccurate since it includes a sufficient number of illegal votes as to render the final outcome doubtful.
As the Supreme Court stated in Dowling and Lewis, where the illegalities in an election are of such a “serious nature” as to deprive the voters of the free expression of their will, the election will be set aside and nullified. The illegal practices were of such serious nature in the instant case.
*795 Accordingly, the judgment of the trial court is annulled and set aside. It is further ordered and decreed that the Democratic 2nd Primary Election for Representative in Congress for the 1st Congressional District held on October 2, 1976, is annulled, and the certification of the Democratic nominee resulting therefrom is vacated and set aside.
ANNULLED AND SET ASIDE.
REDMANN and BOUTALL, JJ., concurs with written reasons.
SCHOTT, J., concurs with additional reasons.
MORIAL, J., specially concurs for the reasons assigned by REDMANN, J.

. See LSA-R.S. 18:1193(B).

. Ward 3, Precinct 6, St. Bernard Parish; Ward 4, Precinct 1, St. Bernard Parish; and, Ward 4, Precinct 2, St. Bernard Parish.

.The deceased persons are 1) Frances L. Hen-ritzy, 2) Leonard W. Miller, died November 1, 1974, and 3) Irene B. Strauch, died August 10, 1976.

. Those precincts are as follows: Ward 1, Precinct 1, Precinct 3, Precinct 4; Ward 2, Precinct 1, Precinct 2, Precinct 5, Precinct 6; Ward 3, Precinct 1, Precinct 2, Precinct 3, Precinct 4, Precinct 6; Ward 4, Precinct 1, Precinct 2, Precinct 3.